Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued November 18, 2002      Decided June 17, 2003

No. 02-5254
& No. 02–5300

CENTER FOR NATIONAL SECURITY STUDIES, ET AL.,
APPELLANTS/CROSS–APPELLEES

v.

U.S. DEPARTMENT OF JUSTICE,
APPELLEES/CROSS–APPELLANTS

————

Appeals from the United States District Court
for the District of Columbia
(No. 01cv02500)

————

*Gregory G. Katsas*, Deputy Assistant Attorney General, argued the cause for appellants/cross-appellees. With him on the briefs were *Roscoe C. Howard, Jr.*, U.S. Attorney, *Mark B. Stern*, *Robert M. Loeb*, and *Eric D. Miller*, Attorneys, U.S. Department of Justice.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Daniel J. Popeo* and *Paul D. Kamenar* were on the brief for *amici curiae* Washington Legal Foundation and the Jewish Institute for National Security Affairs in support of appellant urging partial reversal.

*Kate A. Martin* argued the cause for appellees/cross-appellants. With her on the briefs were *David L. Sobel, Elliot M. Mincberg, Arthur B. Spitzer, Steven R. Shapiro,* and *Lucas Guttentag.*

*Laura R. Handman, Eric N. Lieberman, Henry S. Hoberman, Nathan E. Siegel, Richard M. Schmidt, Jr., Slade R. Metcalf, David E. McCraw, Rene Milam, Bruce W. Sanford* and *Robert D. Lystad* were on the brief for *amici curiae* The Washington Post Company, et al., in support of appellees/cross-appellants.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Dissenting opinion filed by *Circuit Judge* TATEL.

SENTELLE, *Circuit Judge*: Various "public interest" groups (plaintiffs) brought this Freedom of Information Act (FOIA) action against the Department of Justice (DOJ or government) seeking release of information concerning persons detained in the wake of the September 11 terrorist attacks, including: their names, their attorneys, dates of arrest and release, locations of arrest and detention, and reasons for detention. The government objected to release, and asserted numerous exceptions to FOIA requirements in order to justify withholding the information. The parties filed cross-motions for summary judgment. The district court ordered release of the names of the detainees and their attorneys, but held that the government could withhold all other detention information pursuant to FOIA Exemption 7(A), which exempts "records or information compiled for law enforcement purposes . . . to the extent that the production" of them "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A) (2000). Attorneys filed cross-appeals. Upon *de novo* review, we agree with the

district court that the detention information is properly covered by Exemption 7(A); but we further hold that Exemption 7(A) justifies withholding the names of the detainees and their attorneys. We also reject plaintiffs' alternate theories that the First Amendment and the common law mandate disclosure of the contested information. We therefore affirm in part, reverse in part, and remand the case to the district court for the entry of a judgment of dismissal.

## I. Background

### A. The Investigation

Consistent with the mutual decision of the parties to seek resolution to this controversy on summary judgment, the facts are not in serious dispute. In response to the terrorist attacks of September 11, 2001, President George W. Bush ordered a worldwide investigation into those attacks and into "threats, conspiracies, and attempts to perpetrate terrorist acts against United States citizens and interests." The Department of Justice, defendant in this action, has been conducting the investigation in conjunction with other federal, state and local agencies. The investigation continues today.

In the course of the post-September 11 investigation, the government interviewed over one thousand individuals about whom concern had arisen. The concerns related to some of these individuals were resolved by the interviews, and no further action was taken with respect to them. Other interviews resulted in the interviewees being detained. As relevant here, these detainees fall into three general categories.

The first category of detainees consists of individuals who were questioned in the course of the investigation and detained by the INS for violation of the immigration laws (INS detainees). INS detainees were initially questioned because there were "indications that they might have connections with, or possess information pertaining to, terrorist activity against the United States including particularly the September 11 attacks and/or the individuals or organizations who perpetrated them." Based on the initial questioning, each INS detainee was determined to have violated immigration

law; some of the INS detainees were also determined to "have links to other facets of the investigation." Over 700 individuals were detained on INS charges. As of June 13, 2002, only seventy-four remained in custody. Many have been deported. INS detainees have had access to counsel, and the INS has provided detainees with lists of attorneys willing to represent them, as required by 8 U.S.C. § 1229(b)(2) (2000). INS detainees have had access to the courts to file *habeas corpus* petitions. They have also been free to disclose their names to the public.

The second category of detainees consists of individuals held on federal criminal charges (criminal detainees). The government asserts that none of these detainees can be eliminated as a source of probative information until after the investigation is completed. According to the most recent information released by the Department of Justice, 134 individuals have been detained on federal criminal charges in the post-September 11 investigation; 99 of these have been found guilty either through pleas or trials. While many of the crimes bear no direct connection to terrorism, several criminal detainees have been charged with terrorism-related crimes, and many others have been charged with visa or passport forgery, perjury, identification fraud, and illegal possession of weapons. Zacarias Moussaoui, presently on trial for participating in the September 11 attacks, is among those who were detained on criminal charges.

The third category consists of persons detained after a judge issued a material witness warrant to secure their testimony before a grand jury, pursuant to the material witness statute, 18 U.S.C. § 3144 (2000) (material witness detainees). Each material witness detainee was believed to have information material to the events of September 11. The district courts before which these material witnesses have appeared have issued sealing orders that prohibit the government from releasing any information about the proceedings. The government has not revealed how many individuals were detained on material witness warrants. At least two individuals initially held as material witnesses are now being held for alleged terrorist activity.

The criminal detainees and material witness detainees are free to retain counsel and have been provided court-appointed counsel if they cannot afford representation, as required by the Sixth Amendment to the Constitution. In sum, each of the detainees has had access to counsel, access to the courts, and freedom to contact the press or the public at large.

B. The Litigation

On October 29, 2001, plaintiffs submitted a FOIA request to the Department of Justice seeking the following information about each detainee: 1) name and citizenship status; 2) location of arrest and place of detention; 3) date of detention/arrest, date any charges were filed, and the date of release; 4) nature of charges or basis for detention, and the disposition of such charges or basis; 5) names and addresses of lawyers representing any detainees; 6) identities of any courts which have been requested to enter orders sealing any proceedings in connection with any detainees, copies of any such orders, and the legal authorities relied upon by the government in seeking the sealing orders; 7) all policy directives or guidance issued to officials about making public statements or disclosures about these individuals or about the sealing of judicial or immigration proceedings. To support its FOIA request, plaintiffs cited press reports about mistreatment of the detainees, which plaintiffs claimed raised serious questions about "deprivations of fundamental due process, including imprisonment without probable cause, interference with the right to counsel, and threats of serious bodily injury."

In response to plaintiffs' FOIA request, the government released some information, but withheld much of the information requested. As to INS detainees, the government withheld the detainees' names, locations of arrest and detention, the dates of release, and the names of lawyers. As to criminal detainees, the government withheld the dates and locations of arrest and detention, the dates of release, and the citizenship status of each detainee. The government withheld all requested information with respect to material witnesses. Although the government has refused to disclose a compre-

hensive list of detainees' names and other detention information sought by plaintiffs, the government has from time to time publicly revealed names and information of the type sought by plaintiffs regarding a few individual detainees, particularly those found to have some connection to terrorism.

On December 5, 2001, plaintiffs filed this action in district court seeking to compel release of the withheld information pursuant to the Freedom of Information Act, 5 U.S.C. § 552. Plaintiffs also argued that the First Amendment, as interpreted in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) and its progeny, and the common law doctrine of access to public records require the government to disclose the names and detention information of the detainees.

The parties filed cross-motions for summary judgment. In its motion, the government contended that FOIA Exemptions 7(A), 7(C), and 7(F), 5 U.S.C. § 552(b)(7)(A), (C) & (F), allow the government to withhold the requested documents as to all three categories of detainees. These exemptions permit withholding information "compiled for law enforcement purposes" whenever disclosure:

> (A) could reasonably be expected to interfere with enforcement proceedings, . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, . . . or (F) could reasonably be expected to endanger the life or physical safety of any individual.

5 U.S.C. § 552(b)(7)(A), (C), (F). As to the material witness detainees, the government also invoked Exemption 3, 5 U.S.C. § 552(b)(3), which exempts from FOIA requirements matters that are "specifically exempted from disclosure by [other statutes] . . . ," contending that Federal Rule of Criminal Procedure 6(e), which limits the disclosure of grand jury matters, bars the release of information concerning material witnesses.

In support of its motion, the government submitted affidavits from James Reynolds, Director of the Terrorism and Violent Crime Section of the Department of Justice, and Dale

Watson, FBI Executive Assistant Director for Counterterrorism—officials with central responsibility for the ongoing terrorist investigation. *See* Reynolds Decl., Reynolds Supp. Decl., Reynolds Second Supp. Decl., and Watson Decl.

As to Exemption 7(A), the declarations state that release of the requested information could hamper the ongoing investigation by leading to the identification of detainees by terrorist groups, resulting in terrorists either intimidating or cutting off communication with the detainees; by revealing the progress and direction of the ongoing investigation, thus allowing terrorists to impede or evade the investigation; and by enabling terrorists to create false or misleading evidence. As to Exemption 7(C), the declarations assert that the detainees have a substantial privacy interest in their names and detention information because release of this information would associate detainees with the September 11 attacks, thus injuring detainees' reputations and possibly endangering detainees' personal safety. Finally, as to Exemption 7(F), the government's declarations contend that release of the information could endanger the public safety by making terrorist attacks more likely and could endanger the safety of individual detainees by making them more vulnerable to attack from terrorist organizations. For these same reasons, the counterterrorism officials state that the names of the detainees' lawyers should also be withheld.

C. The Judgment

On August 2, 2002, the district court rendered its decision, ruling in part for the plaintiffs and in part for the government. *Ctr. for Nat'l Sec. Studies v. United States Dep't of Justice*, 215 F. Supp. 2d 94 (D.D.C. 2002) (*CNSS*). Briefly put, the court ordered the government to disclose the names of the detainees and detainees' lawyers, but held that the government was entitled to withhold all other detention information under Exemptions 7(A) and 7(F). *Id.* at 113.

Addressing the names of the detainees, the court held that disclosure could not reasonably be expected to interfere with ongoing enforcement proceedings, and thus the names were not exempt under 7(A). The court rejected the government's

argument that disclosure of detainees' names would deter them from cooperating with the government because terrorist groups likely already know which of their cell members have been detained. *Id.* at 101. Moreover, the court reasoned that the government's voluntary disclosure of the names of several detainees undermined the force of its argument about the harms resulting from disclosure. *Id.* at 101–02. The court further held that "the government has not met its burden of establishing a 'rational link' between the harms alleged and disclosure" because its declarations provided no evidence that the detainees actually have any connection to, or knowledge of, terrorist activity. *Id.* at 102 (quoting *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986)).

The court next rejected the government's 7(A) argument that disclosure of names would allow terrorist groups to map the course of, and thus impede, its investigation. *Id.* at 103. The government had advanced a "mosaic" argument, contending that the court should consider the aggregate release of the names under 7(A) rather than the release of each in isolation, on the reasoning that the release of the names *in toto* could assist terrorists in piecing together the course, direction and focus of the investigation. *Id.* at 103. The district court rejected this argument, holding, *inter alia*, as a matter of law that FOIA Exemption 7(A) requires an individualized assessment of disclosure, and that the government's mosaic theory could not justify a blanket exclusion of information under Exemption 7(A). *Id.* at 103–04. In the district court's view, the mosaic theory is only cognizable under Exemption 1, which protects information authorized by Executive Order to be kept secret in the interest of national defense or foreign policy. *Id.* The court further rejected the government's final 7(A) argument, concluding that there was insufficient evidence that disclosure would enable terrorist groups to create false and misleading evidence. *Id.* at 104–05.

Turning to Exemptions 7(C) and 7(F), the court rejected the government's claims, holding that the admittedly substantial privacy and safety interests of the detainees do not

outweigh the vital public interest in ensuring that the government is not abusing its power. *Id.* at 105–06. The court noted that plaintiffs have raised "grave concerns" about the mistreatment of detainees and have provided evidence of alleged mistreatment in the form of media reports, and first-hand accounts given to Congress and human rights groups. *Id.* at 105 & n.17. While rejecting the government's attempt to withhold detainees' names, the court ruled that it would permit detainees to opt out of disclosure by submitting a signed declaration within fifteen days. *Id.* at 106. The court did not address the government's argument that disclosure could harm public safety.

Having rejected the government's Exemption 7 claims, the court further held that Exemption 3 does not bar the release of the names of material witnesses. *Id.* at 106–07. Specifically, the court held that Exemption 3 does not apply, reasoning Federal Rule of Criminal Procedure 6(e) does not bar the disclosure of the identities of persons detained as material witnesses, but only bars "disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6). The government's evidence did not establish that any of the detainees were actual grand jury witnesses or were scheduled to testify before a grand jury. Further, the government's disclosure of the identities of twenty-six material witness detainees undercut its argument that disclosure is barred by statute. 215 F. Supp. 2d at 106–07. As to the government's contention that court sealing orders prevent the government from releasing the names of material witnesses, the court ordered the government to submit such orders for *in camera* review or to submit a "supplemental affidavit explaining the nature and legal basis for these sealing orders." *Id.* at 108.

For reasons not unlike its rejection of the government's attempt to withhold the names of detainees, the court also held that the government must reveal the names of the detainees' lawyers.[1] The court determined that the names of

---

[1] The government has withheld the names of the attorneys for both INS detainees and material witness detainees; it has revealed the names of the attorneys for the criminally charged detainees.

the attorneys were not covered by Exemptions 7(A), 7(C), or 7(F) for the same reason it had rejected the government's attempt to withhold the names of detainees; because attorneys have no expectation of anonymity; and because any concerns about physical danger were purely speculative. *Id.* at 109.

Turning to the other information sought by plaintiffs—the dates and locations of arrest, detention, and release—the court granted summary judgment for the government on its claim that such detention information was covered under 7(A) and 7(F). *Id.* at 108. The court credited the counterterrorism officials' judgment that the detention information "would be particularly valuable to anyone attempting to discern patterns in the Government's investigation and strategy," and that disclosure would make detention facilities "vulnerable to retaliatory attacks." *Id.* Finally, the court rejected plaintiffs' claim that the First Amendment and common law entitle them to the dates and locations of arrest, detention, and release. *Id.* at 111–12.

The court ordered the government to release the names of detainees and their lawyers in fifteen days, subject to the right of detainees to opt out of disclosure. *Id.* at 113–14. On August 15, 2002, the district court stayed its order pending appeal. The government timely appealed. Plaintiffs cross-appealed the district court's ruling that the detention information was properly withheld and the district court's ruling that detainees could opt out of disclosure. The appeals were consolidated.

## II.   The FOIA Claims

We review *de novo* the district court's grant of summary judgment, *Johnson v. Executive Office for United States Attorneys,* 310 F.3d 771, 774 (D.C. Cir. 2002), and therefore consider anew each of the claims and defenses advanced before the district court. We turn first to the government's claims of exemption from disclosure under FOIA of the names of the detainees and their lawyers.

A. Names of Detainees

"Public access to government documents" is the "fundamental principle" that animates FOIA. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). Accordingly, FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential. *John Doe Agency*, 493 U.S. at 152. To that end, FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exemptions, *see* 5 U.S.C. § 552(b). While these exemptions are to be "narrowly construed," *FBI v. Abramson*, 456 U.S. 615, 630 (1982), courts must not fail to give them "a meaningful reach and application," *John Doe Agency*, 493 U.S. at 152. The government bears the burden of proving that the withheld information falls within the exemptions it invokes. 5 U.S.C. § 552(a)(4)(b).

The government invokes four exemptions—7(A), 7(C), 7(F), and 3—to shield the names of detainees from disclosure. Upon review, we hold that Exemption 7(A) was properly invoked to withhold the names of the detainees and their lawyers. Finding the names protected under 7(A), we need not address the other exemptions invoked by the government and reserve judgment on whether they too would support withholding the names.

Exemption 7(A) allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). In enacting this exemption, "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations." *NRLB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978). Exemption 7(A) does not require a presently pending "enforcement proceeding."

Rather, as the district court correctly noted, it is sufficient that the government's ongoing September 11 terrorism investigation is likely to lead to such proceedings. *See CNSS*, 215 F. Supp. 2d at 101 n.9 (citing *Bevis v. Dep't of State*, 801 F.2d 1386 (D.C. Cir. 1986)).

The threshold question here is whether the names of detainees were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Because the DOJ is an agency "specializ[ing] in law enforcement," its claim of a law enforcement purpose is entitled to deference. *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998); *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996); *Pratt v. Webster*, 673 F.2d 408, 419 (D.C. Cir. 1982). To establish a law enforcement purpose, DOJ's declarations must establish (1) "a rational nexus between the investigation and one of the agency's law enforcement duties;" and (2) "a connection between an individual or incident and a possible security risk or violation of federal law." *Campbell*, 164 F.3d at 32 (citations and quotations omitted); *see also Quinon*, 86 F.3d at 1228. The government's proffer easily meets this standard. The terrorism investigation is one of DOJ's chief "law enforcement duties" at this time, *see* Reynolds Decl. ¶ 2, and the investigation concerns a heinous violation of federal law as well as a breach of this nation's security. Moreover, the names of the detainees and their connection to the investigation came to the government's attention as a result of that law enforcement investigation. Reynolds Decl. ¶ ¶ 2–5.

Nonetheless, plaintiffs contend that detainees' names fall outside Exemption 7 because the names are contained in arrest warrants, INS charging documents, and jail records. Since these documents have traditionally been public, plaintiffs contend, Exemption 7 should not be construed to allow withholding of the names. We disagree. Plaintiffs are seeking a comprehensive listing of individuals detained during the post-September 11 investigation. The names have been compiled for the "law enforcement purpose" of successfully prosecuting the terrorism investigation. As compiled, they constitute a comprehensive diagram of the law enforcement

investigation after September 11. Clearly this is information compiled for law enforcement purposes.

Next, plaintiffs urge that Exemption 7(A) does not apply because disclosure is not "reasonably likely to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). We disagree. Under Exemption 7(A), the government has the burden of demonstrating a reasonable likelihood of interference with the terrorism investigation. The government's declarations, viewed in light of the appropriate deference to the executive on issues of national security, satisfy this burden.

It is well-established that a court may rely on government affidavits to support the withholding of documents under FOIA exemptions, *King v. United States Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987), and that we review the government's justifications therein *de novo*, 5 U.S.C. § 552(a)(4)(B); *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). It is equally well-established that the judiciary owes some measure of deference to the executive in cases implicating national security, a uniquely executive purview. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001) (noting that "terrorism or other special circumstances" might warrant "heightened deference to the judgments of the political branches"); *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) ("courts traditionally have been reluctant to intrude upon the authority of the executive in military and national security affairs"). Indeed, both the Supreme Court and this Court have expressly recognized the propriety of deference to the executive in the context of FOIA claims which implicate national security.

In *CIA v. Sims*, 471 U.S. 159 (1985), the Supreme Court examined the CIA's claims that the names and institutional affiliations of certain researchers in a government-sponsored behavior modification program were exempt from disclosure under FOIA Exemption 3, 5 U.S.C. § 552(b)(3). *Id.* at 163–64. The agency claimed that the information was protected from disclosure by a statute charging the CIA to prevent unauthorized disclosure of "intelligence sources and meth-

ods," 50 U.S.C. § 403(d)(3). In accepting the CIA Director's judgment that disclosure would reveal intelligence sources and methods, the Court explained that "[t]he decisions of the Director, who must of course be familiar with 'the whole picture,' as judges are not, are worthy of great deference given the magnitude of the national security interests and potential risks at stake." *Sims*, 471 U.S. at 179. The Court further held that "it is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of subtle and complex factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." *Id.* at 180.

The same is true of the Justice Department officials in charge of the present investigation. We have consistently reiterated the principle of deference to the executive in the FOIA context when national security concerns are implicated. In *McGehee v. Casey*, we examined the standard of review for FOIA requests of classified documents. 718 F.2d 1137, 1148 (D.C. Cir. 1983). We observed:

> [C]ourts are to "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record" because "the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular classified record."

*Id.* (quoting S. Rep. No. 1200, 93d Cong., 2d Sess. 12, U.S.C.C.A.N. 1974, p. 6267 (1974) (Conference Report on the FOIA Amendments)). Moreover, in the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review. *See, e.g., King*, 830 F.2d at 217 ("the court owes substantial weight to detailed agency explanations in the national security context"); *Gardels v. CIA*, 689 F.2d 1100, 1104 (D.C. Cir. 1982) ("Once satisfied that proper procedures have been followed and that the information logically falls into the exemption claimed, the

courts need not go further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith."); *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980); *Weissman v. CIA*, 565 F.2d 692, 697–98 (D.C. Cir. 1977).

Given this weight of authority counseling deference in national security matters, we owe deference to the government's judgments contained in its affidavits. Just as we have deferred to the executive when it invokes FOIA Exemptions 1 and 3, we owe the same deference under Exemption 7(A) in appropriate cases, such as this one. *Id.* Plaintiffs provide no valid reason why the general principle of deference to the executive on national security issues should apply under FOIA Exemption 3, as in *Sims* and *Halperin*, and Exemption 1, as in our earlier cases, but not under Exemption 7(A). Nor can we can conceive of any reason to limit deference to the executive in its area of expertise to certain FOIA exemptions so long as the government's declarations raise legitimate concerns that disclosure would impair national security.

The need for deference in this case is just as strong as in earlier cases. America faces an enemy just as real as its former Cold War foes, with capabilities beyond the capacity of the judiciary to explore. Exemption 7(A) explicitly requires a predictive judgment of the harm that will result from disclosure of information, permitting withholding when it "could reasonably be expected" that the harm will result. 5 U.S.C. § 552(b)(7)(A). It is abundantly clear that the government's top counterterrorism officials are well-suited to make this predictive judgment. Conversely, the judiciary is in an extremely poor position to second-guess the executive's judgment in this area of national security. *Cf. Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993) (quoting *Halperin*, 629 F.2d at 148) ("Judges . . . lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case."). We therefore reject any attempt to artificially limit the long-recognized deference to the executive on national security issues. Judicial deference depends on the substance of the danger posed by disclosure—that is,

harm to the national security—not the FOIA exemption invoked.

In light of the deference mandated by the separation of powers and Supreme Court precedent, we hold that the government's expectation that disclosure of the detainees' names would enable al Qaeda or other terrorist groups to map the course of the investigation and thus develop the means to impede it is reasonable. A complete list of names informing terrorists of every suspect detained by the government at any point during the September 11 investigation would give terrorist organizations a composite picture of the government investigation, and since these organizations would generally know the activities and locations of its members on or about September 11, disclosure would inform terrorists of both the substantive and geographic focus of the investigation. Moreover, disclosure would inform terrorists which of their members were compromised by the investigation, and which were not. This information could allow terrorists to better evade the ongoing investigation and more easily formulate or revise counter-efforts. In short, the "records could reveal much about the focus and scope of the [agency's] investigation, and are thus precisely the sort of information exemption 7(A) allows an agency to keep secret." *Swan v. SEC*, 96 F.3d 498, 500 (D.C. Cir. 1996).

As the district court noted, courts have relied on similar mosaic arguments in the context of national security. *CNSS*, 215 F. Supp. 2d at 103 & n.13. In *Sims*, for example, the Supreme Court cautioned that "bits and pieces" of data " 'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.' " 471 U.S. at 178 (quoting *Halperin*, 629 F.2d at 150). Thus, "[w]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *Id.* (quotations omitted). Such a danger is present here. While the name of any individual detainee may appear innocuous or trivial, it could be of great use to al Qaeda in plotting future terrorist attacks or intimidating witnesses in the present investigation. *Cf. United States v.*

*Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) ("[t]hings that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."). Importantly, plaintiffs here do not request "bits and pieces" of information, but rather seek the names of every single individual detained in the course of the government's terrorism investigation. It is more than reasonable to expect that disclosing the name of every individual detained in the post-September 11 terrorism investigation would interfere with that investigation.

Similarly, the government's judgment that disclosure would deter or hinder cooperation by detainees is reasonable. The government reasonably predicts that if terrorists learn one of their members has been detained, they would attempt to deter any further cooperation by that member through intimidation, physical coercion, or by cutting off all contact with the detainee. A terrorist organization may even seek to hunt down detainees (or their families) who are not members of the organization, but who the terrorists know may have valuable information about the organization.

On numerous occasions, both the Supreme Court and this Court have found government declarations expressing the likelihood of witness intimidation and evidence tampering sufficient to justify withholding of witnesses' names under Exemption 7(A). *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 239–42 (1978) (allowing withholding pursuant to Exemption 7(A) based on the risk of witness intimidation that would attend releasing witness statements prior to NLRB proceedings); *Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 312–13 (D.C. Cir. 1988) (upholding 7(A) claim based on government declaration that disclosure would enable corporation under investigation to intimidate or coerce informing employees); *accord Mapother v. Dep't of Justice*, 3 F.3d 1533, 1542–43 (D.C. Cir. 1993) (recognizing that government affidavits predicting witness intimidation and evidence fabrication "have achieved recognition in Exemption 7 caselaw"); *Manna v. Dep't of Justice*, 51 F.3d 1158, 1165 (3d Cir. 1995) (allowing

withholding of names of all "interviewees, informants, [and] witnesses" in criminal investigation based on fears of retaliation from organized crime). Most recently, we addressed in *Swan* a FOIA request that would have resulted in the disclosure of, *inter alia*, the identities of witnesses in an SEC investigation. 96 F.3d at 499. The SEC's declaration alleged that disclosure would risk allowing the subjects of the investigation to "intimidate witnesses, manufacture favorable evidence, and conceal damaging evidence." *Id.* We accepted the SEC's declaration and allowed the documents to be withheld. *Id.* at 499, 500. The risks of witness intimidation and evidence tampering alleged here are at least as great as those in *Swan* and our other precedents. We see no reason to assume that terrorists are less likely to intimidate the detainees here than were the subjects of the SEC investigation in *Swan.* Consequently, we hold that disclosure of detainees' names could "reasonably be expected to interfere" with the ongoing terrorism investigation.

For several reasons, plaintiffs contend that we should reject the government's predictive judgments of the harms that would result from disclosure. First, they argue that terrorist organizations likely already know which of their members have been detained. We have no way of assessing that likelihood. Moreover, even if terrorist organizations know about some of their members who were detained, a complete list of detainees could still have great value in confirming the status of their members. *Cf. Gardels*, 689 F.2d at 1105 (rejecting a similar argument in the FOIA national security context and stating that "[o]fficial acknowledgment ends all doubt and gives the foreign organization a firmer basis for its own strategic or tactical response."). For example, an organization may be unaware of a member who was detained briefly and then released, but remains subject to continuing government surveillance. Reynolds Supp. Decl. ¶ ¶ 3, 5. After disclosure, this detainee could be irreparably compromised as a source of information.

More importantly, some detainees may not be members of terrorist organizations, but may nonetheless have been detained on INS or material witness warrants as having infor-

mation about terrorists. Terrorist organizations are less likely to be aware of such individuals' status as detainees. Such detainees could be acquaintances of the September 11 terrorists, or members of the same community groups or mosques. *See* Rachel L. Swarns, *Oregon Muslims Protest Monthlong Detention Without a Charge*, N.Y. TIMES, April 20, 2003, at A16 (describing material witness detainee who attended same mosque as indicted terrorism suspects). These detainees, fearing retribution or stigma, would be less likely to cooperate with the investigation if their names are disclosed. Moreover, tracking down the background and location of these detainees could give terrorists insights into the investigation they would otherwise be unlikely to have. After disclosure, terrorist organizations could attempt to intimidate these detainees or their families, or feed the detainees false or misleading information. It is important to remember that many of these detainees have been released at this time and are thus especially vulnerable to intimidation or coercion. While the detainees have been free to disclose their names to the press or public, it is telling that so few have come forward, perhaps for fear of this very intimidation.

We further note the impact disclosure could have on the government's investigation going forward. A potential witness or informant may be much less likely to come forward and cooperate with the investigation if he believes his name will be made public. *Cf. Sims*, 471 U.S. at 172 (noting Congress's concern that intelligence sources will "close up like a clam" unless the government maintains complete confidentiality); *Manna*, 51 F.3d at 1165 ("disclosure . . . could result in a chilling effect upon potential cooperators and witnesses").

Plaintiffs next argue that the government's predictive judgment is undermined by the government's disclosure of some of the detainees' names. The Supreme Court confronted a similar argument in *Sims*, in which respondents contended that "because the Agency has already revealed the names of many of the institutions at which [behavior modification] research was performed, the Agency is somehow estopped from withholding the names of others." 471 U.S. at 180. In

rejecting the argument, the Court stated that "[t]his suggestion overlooks the political realities of intelligence operations in which, among other things, our Government may choose to release information deliberately to 'send a message' to allies or adversaries." *Id.* We likewise reject the plaintiffs' version of this discredited argument. The disclosure of a few pieces of information in no way lessens the government's argument that complete disclosure would provide a composite picture of its investigation and have negative effects on the investigation. Furthermore, as the *Sims* Court recognized, strategic disclosures can be important weapons in the government's arsenal during a law enforcement investigation. *Id.* ("The national interest sometimes makes it advisable, or even imperative, to disclose information that may lead to the identity of intelligence sources."). The court should not second-guess the executive's judgment in this area. "[I]t is the responsibility of the [executive] not that of the judiciary" to determine when to disclose information that may compromise intelligence sources and methods. *Id.*

Contrary to plaintiffs' claims, the government's submissions easily establish an adequate connection between both the material witness and the INS detainees and terrorism to warrant full application of the deference principle. First, all material witness detainees have been held on warrants issued by a federal judge pursuant to 18 U.S.C. § 3144. Reynolds Decl. ¶ 4. Under this statute, a federal judge may issue a material witness warrant based on an affidavit stating that the witness has information relevant to an ongoing criminal investigation. Consequently, material witness detainees have been found by a federal judge to have relevant knowledge about the terrorism investigation. It is therefore reasonable to assume that disclosure of their names could impede the government's use of these potentially valuable witnesses.

As to the INS detainees, the government states that they were

> originally questioned because there were indications that they might have connections with, or possess information pertaining to, terrorist activity against the United States

including particularly the September 11 attacks and/or the individuals and organizations who perpetrated them. For example, they may have been questioned because they were identified as having interacted with the hijackers, or were believed to have information relating to other aspects of the investigation.

Reynolds Decl. ¶ 10. "Other INS detainees may have been questioned because of their association with an organization believed to be involved in providing material support to terrorist organizations." Watson Decl. ¶ 8. Moreover, "[i]n the course of questioning them, law enforcement agents determined, often from the subjects themselves, that they were in violation of federal immigration laws, and, in some instances also determined that they had links to other facets of the investigation." Reynolds Decl. ¶ 10; Watson Decl. ¶ 8. Furthermore, the Watson Declaration speaks of the INS detainees being subject to "public hearings involving evidence about terrorist links," ¶ 16, and states that "concerns remain" about links to terrorism, ¶ 19. The clear import of the declarations is that many of the detainees have links to terrorism. This comes as no surprise given that the detainees were apprehended during the course of a terrorism investigation, and given that several detainees have been charged with federal terrorism crimes or held as enemy combatants. Accordingly, we conclude that the evidence presented in the declarations is sufficient to show a rational link between disclosure and the harms alleged.

In support of this conclusion, we note that the Third Circuit confronted a similar issue involving the INS detainees when it considered the constitutionality of closed deportation hearings in *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002), *cert. denied*, No. 02–1289 (May 27, 2003). The court was faced with the same Watson Declaration in evidence here and the same government prediction that harm would result from the disclosure of information about the INS detainees. *See id.* at 218. That court acknowledged that the "representations of the Watson Declaration are to some degree speculative." *Id.* at 219. But the court did not search for specific evidence that each of the INS detainees was

involved in terrorism, nor did it embark on a probing analysis of whether the government's concerns were well-founded. *Id.* Rather, it was "quite hesitant to conduct a judicial inquiry into the credibility of these security concerns, as national security is an area where courts have traditionally extended great deference to Executive expertise." *Id.* The court concluded: "To the extent that the Attorney General's national security concerns seem credible, we will not lightly second-guess them." *Id.* We think the Third Circuit's approach was correct and we follow it here. Inasmuch as the concerns expressed in the government's declarations seem credible—and inasmuch as the declarations were made by counterterrorism experts with far greater knowledge than this Court—we hold that the disclosure of the names of the detainees could reasonably be expected to interfere with the ongoing investigation.

In upholding the government's invocation of Exemption 7(A), we observe that we are in accord with several federal courts that have wisely respected the executive's judgment in prosecuting the national response to terrorism. *See Hamdi v. Rumsfeld*, 316 F.3d 450 (4th Cir. 2003) (dismissing the *habeas corpus* petition of a United States citizen captured in Afghanistan challenging his military detention and designation as an enemy combatant); *Global Relief Found. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002) (upholding against constitutional challenge a portion of the USA PATRIOT Act, 50 U.S.C. § 1702(c), which authorizes the *ex parte* use of classified evidence in proceedings to freeze the assets of terrorist organizations); *North Jersey Media Group*, 308 F.3d 198 (holding that closure of "special interest" deportation hearings involving INS detainees with alleged connections to terrorism does not violate the First Amendment); *Hamdi v. Rumsfeld*, 296 F.3d 278 (4th Cir. 2002) (reversing district court's order that allowed alleged enemy combatant unmonitored access to counsel). We realize that not all courts are in agreement. In *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002), the Sixth Circuit acknowledged the necessity of deferring to the executive on terrorism issues but held that the First Amendment prohibits a blanket closure of "special interest deportation hearings." We do not

find the Sixth Circuit's reasoning compelling, but join the Third, Fourth, and Seventh Circuits in holding that the courts must defer to the executive on decisions of national security. In so deferring, we do not abdicate the role of the judiciary. Rather, in undertaking a deferential review we simply recognize the different roles underlying the constitutional separation of powers. It is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role. The judgment of the district court ordering the government to disclose the names of the detainees is reversed.

B. Identity of Counsel

We next address whether the government properly withheld the names of the attorneys for INS and material witness detainees under Exemptions 7(A), 7(C), and 7(F). As with the identities of the detainees, we hold that their attorneys' names are also protected from disclosure by Exemption 7(A).

The government contends that a list of attorneys for the detainees would facilitate the easy compilation of a list of all detainees, and all of the dangers flowing therefrom. It is more than reasonable to assume that plaintiffs and *amici* press organizations would attempt to contact detainees' attorneys and compile a list of all detainees. As discussed above, if such a list fell into the hands of al Qaeda, the consequences could be disastrous. Having accepted the government's predictive judgments about the dangers of disclosing a comprehensive list of detainees, we also defer to its prediction that disclosure of attorneys' names involves the same danger. *Cf. Sims*, 471 U.S. at 179–80 (upholding under FOIA Exemption 3 the government's withholding of the institutional affiliations of researchers in a secret government program; deferring to government's judgment that disclosure would lead to identification of the researchers themselves and the consequent loss of confidential intelligence sources).

C. Other Detention Information

Having held that the government properly withheld the names of the detainees pursuant to Exemption 7(A), we easily

affirm the portion of the district court's ruling that allowed withholding, under Exemption 7(A), of the more comprehensive detention information sought by plaintiffs.

As outlined above, *supra* at 5, plaintiffs sought the dates and locations of arrest, detention, and release for each of the detainees. Even more than disclosure of the identities of detainees, the information requested here would provide a complete roadmap of the government's investigation. Knowing when and where each individual was arrested would provide a chronological and geographical picture of the government investigation. Terrorists could learn from this information not only where the government focused its investigation but how that investigation progressed step by step. Armed with that knowledge, they could then reach such conclusions as, for example, which cells had been compromised, and which individuals had been cooperative with the United States. They might well be able to derive conclusions as to how more adequately secure their clandestine operations in future terrorist undertakings. Similarly, knowing where each individual is presently held could facilitate communication between terrorist organizations and detainees and the attendant intimidation of witnesses and fabrication of evidence. As explained in detail above, these impediments to an ongoing law enforcement investigation are precisely what Exemption 7(A) was enacted to preclude. Accordingly, we affirm the district court and hold that the government properly withheld information about the dates and locations of arrest, detention, and release for each detainee.

## III.  Alternative Grounds

We turn now to plaintiffs' alternative grounds for seeking disclosure of the detainees' names and detention information. Although FOIA does not mandate disclosure, plaintiffs contend that disclosure is independently required by both the First Amendment and the common law right of access to government information. We address these contentions in turn, and conclude that neither is meritorious.

A.   The First Amendment

As outlined above, the government voluntarily released the names of all criminally charged detainees.  Therefore, as in its FOIA request, plaintiffs seek the names of INS and material witness detainees, and the dates and location of arrest, detention, and release for all detainees.  Plaintiffs characterize the information they seek as "arrest records," and contend that the public has a right of access to arrest records under the First Amendment, as interpreted in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).  We disagree.  Plaintiffs seek not individual arrest records, but a comprehensive listing of the individuals detained in connection with a specified law enforcement investigation as well as investigatory information about where and when each individual was arrested, held, and released.  The narrow First Amendment right of access to information recognized in *Richmond Newspapers* does not extend to non-judicial documents that are not part of a criminal trial, such as the investigatory documents at issue here.

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I.  In accord with its plain language, the First Amendment broadly protects the freedom of individuals and the press to speak or publish.  It does not expressly address the right of the public to receive information.  Indeed, in contrast to FOIA's statutory presumption of disclosure, the First Amendment does not "mandate[ ] a right of access to government information or sources of information within the government's control."  *Houchins v. KQED*, 438 U.S. 1, 15 (1978) (plurality opinion); *id.* at 16 (Stewart, J., concurring in the judgment) (the First Amendment "do[es] not guarantee the public a right of access to information generated or controlled by the government").  Thus, as the Court explained in *Houchins*: "[t]he public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect.  The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act."  *Id.* at 14 (quoting Potter Stewart, *Or of the Press*, 26 Hastings L.J. 631, 636 (1975)).  Rather, disclo-

sure of government information generally is left to the "political forces" that govern a democratic republic. *Id.* at 14–15.

Two years after *Houchins*, the Court recognized a limited First Amendment right of access to a criminal trial. *See Richmond Newspapers*, 448 U.S. 555. In *Richmond Newspapers*, the Court explained that the First Amendment "was enacted against the backdrop of the long history of trials being historically open" and thus incorporated the notion of public access to criminal trials. *Id.* at 576–77. The Court expanded this limited right somewhat in the years after *Richmond Newspapers*. *See Press–Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) (*Press–Enterprise I*) (holding that the public has a First Amendment right to attend *voir dire* examinations during criminal trial); *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (*Press–Enterprise II*) (holding that the public has a First Amendment right to access transcripts of adversarial preliminary hearings that occur prior to a criminal trial). In *Press–Enterprise II*, the Supreme Court first articulated what has come to be known as the *Richmond Newspapers* "experience and logic" test, by which the Court determines whether the public has a right of access to "criminal proceedings":

> First, because a tradition of accessibility implies the favorable judgment of experience, we have considered whether the place and process have historically been open to the press and general public.... Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.

*Id.* at 8 (citations omitted).

Neither the Supreme Court nor this Court has applied the *Richmond Newspapers* test outside the context of criminal judicial proceedings or the transcripts of such proceedings. When the "experience and logic" test has been applied beyond the trial itself, as in *Press–Enterprise II*, it has been limited to judicial proceedings that are part of the criminal trial process. *See also Washington Post v. Robinson*, 935 F.2d 282, 290 (D.C. Cir. 1991) (holding that First Amendment

protects public access to plea agreement on which judgment has been entered); *but see United States v. El–Sayegh*, 131 F.3d 158, 160–61 (D.C. Cir. 1997) (applying "experience and logic test" but finding no First Amendment right of access to withdrawn plea agreement). Moreover, neither this Court nor the Supreme Court has ever *indicated* that it would apply the *Richmond Newspapers* test to anything other than criminal judicial proceedings. Indeed, there are no federal court precedents requiring, under the First Amendment, disclosure of information compiled during an Executive Branch investigation, such as the information sought in this case.

Indeed, to the extent the Supreme Court has addressed the constitutional right of access to information outside the criminal trial context, the Court has applied the general rule of *Houchins*, not *Richmond Newspapers*. *See LAPD v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) (holding that there is no First Amendment right to receive addresses of arrestees); *Houchins*, 438 U.S. at 13–15 (holding that press has no First Amendment right of access to prisons). In *Houchins*, the Court observed that the press had ample means for obtaining information about prison conditions, "albeit not as conveniently as they prefer." *Id.* at 15. For example, the Court noted that members of the press could receive letters from inmates and interview inmates' attorneys, prison visitors, or former inmates. *Id.* The same is true here. According to the government's declarations, detainees are free to contact family members as well as members of the press. Detainees' attorneys are presumably free to do the same. In *LAPD*, the Court rejected a facial challenge to a state law restricting access to the addresses of arrestees. 528 U.S. at 40. The Court explained that "this is not a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses." *Id.* Rather, "what we have before us is nothing more than a governmental denial of access to information in its possession. California could decide not to give out arrestee information at all without violating the First Amendment." *Id.* (citing *Houchins*, 438 U.S. at 14). Similarly here, the First Amendment is not implicated by the executive's refusal to disclose

the identities of the detainees and information concerning their detention.

We will not convert the First Amendment right of access to criminal judicial proceedings into a requirement that the government disclose information compiled during the exercise of a quintessential executive power—the investigation and prevention of terrorism. The dangers which we have catalogued above of making such release in this case provide ample evidence of the need to follow this course. *Cf. Global Relief Found.*, 315 F.3d at 754 ("The Constitution would indeed be a suicide pact . . . if the only way to curtail enemies' access to assets were to reveal information that might cost lives.") (citation omitted). To be sure, the Sixth Circuit recently held that the public has a constitutional right of access to INS deportation hearings involving the same INS detainees at issue in this case. *See Detroit Free Press*, 303 F.3d 681; *but see North Jersey Media Group*, 308 F.3d 198 (finding no right of access). However, the Sixth Circuit applied *Richmond Newspapers* only after extensively examining the similarity between deportation proceedings and criminal trials, *Detroit Free Press*, 303 F.3d at 696–99, and noting the crucial distinction between "*investigatory* information" and "access to information relating to a governmental *adjudicative* process," *id.* at 699. Inasmuch as plaintiffs here request investigatory—not adjudicative—information, we find *Detroit Free Press* distinguishable. We therefore will not expand the First Amendment right of public access to require disclosure of information compiled during the government's investigation of terrorist acts.

Accordingly, we conclude that the information sought by plaintiffs falls within the general principle announced in *Houchins* and affirmed in *LAPD*, rather than the *Richmond Newspapers* exception to that rule. Plaintiffs have no First Amendment right to receive the identities of INS and material witness detainees, nor are they entitled to receive information about the dates and locations of arrest, detention, and release for each detainee.

B.   The Common Law

We also reject plaintiffs' final claim that disclosure is required by the common law right of access to public records. The Supreme Court held in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978), that "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial documents." *Id.* at 597.   Plaintiffs, citing several state court cases finding a common law right of access to arrest records, urge us to recognize a federal common law right to receive the information they seek.   In response, the government claims that the common law right of access is limited to judicial records. Even if the common law right applies to executive records, the government contends, FOIA has displaced the common law right.   While we question the government's first contention, we accept its second.

This Court has held that the common law right of access extends beyond judicial records to the "public records" of all three branches of government, *Washington Legal Found. v. United States Sentencing Commission*, 89 F.3d 897, 903–04 (D.C. Cir. 1996), and we are bound by our precedent.   We need not decide, however, whether the information sought by plaintiffs is a public record.   Even if it is, the common law right of access is preempted by FOIA.

In *Nixon*, the Supreme Court assumed *arguendo* that the common law right of access covered the tapes sought by the media.   435 U.S. at 599.   Nonetheless, the Court denied disclosure because the Presidential Recordings Act provided a statutory scheme for seeking access to the tapes.   *Id.* at 603–06.   The Court held that the presence of this "alternative means for public access tip[ped] the scales in favor of denying release."   *Id.* at 606.   In *El–Sayegh*, this Court applied *Nixon*'s principle that a statutory disclosure scheme preempts the common law right.   *See* 131 F.3d at 163.   The Court found no common law right of access to a withdrawn plea agreement because "[t]he appropriate device" for access to the records "is a Freedom of Information Act request

addressed to the relevant agency." *Id.* (citing *Nixon*, 435 U.S. at 605–06).

The principles of *Nixon* and *El–Sayegh* apply with full force here. FOIA provides an extensive statutory regime for plaintiffs to request the information they seek. Not only is it uncontested that the requested information meets the general category of information for which FOIA mandates disclosure, but for the reasons set forth above, we have concluded that it falls within an express statutory exemption as well. It would make no sense for Congress to have enacted the balanced scheme of disclosure and exemption, and for the court to carefully apply that statutory scheme, and then to turn and determine that the statute had no effect on a preexisting common law right of access. Congress has provided a carefully calibrated statutory scheme, balancing the benefits and harms of disclosure. That scheme preempts any preexisting common law right.

In accordance with *Nixon* and *El–Sayegh*, we cannot craft federal common law when Congress has spoken directly to the issue at hand. *Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981) ("when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal court disappears"). Consequently, we reject plaintiffs' claim that the common law right of access requires disclosure of the requested information.

## IV. Conclusion

For the reasons set forth above, we conclude that the government was entitled to withhold under FOIA Exemption 7(A) the names of INS detainees and those detained as material witnesses in the course of the post-September 11 terrorism investigation; the dates and locations of arrest, detention, and release of all detainees, including those charged with federal crimes; and the names of counsel for detainees. Finally, neither the First Amendment nor federal

common law requires the government to disclose the information sought by plaintiffs.

*Affirmed in part, reversed in part and remanded.*

1

TATEL, *Circuit Judge, dissenting*: Disregarding settled
principles governing the release of government records under
the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, this
court holds that the government may keep secret the names
of hundreds of persons whom it has detained in connection
with its investigation of the September 11, 2001 terrorist
attacks without distinguishing between information that can,
in FOIA's words, "reasonably be expected to interfere" with
the investigation and information that cannot. 5 U.S.C.
§ 552(b)(7)(A). While the government's reasons for withhold-
ing *some* of the information may well be legitimate, the
court's uncritical deference to the government's vague, poorly
explained arguments for withholding broad categories of in-
formation about the detainees, as well as its willingness to fill
in the factual and logical gaps in the government's case,
eviscerates both FOIA itself and the principles of openness in
government that FOIA embodies.

## I.

I begin with some preliminary observations about the
principles that govern this case. First, no one can doubt that
uniquely compelling governmental interests are at stake: the
government's need to respond to the September 11 attacks—
unquestionably the worst ever acts of terrorism on American
soil—and its ability to defend the nation against future acts of
terrorism. But although this court overlooks it, there is
another compelling interest at stake in this case: the public's
interest in knowing whether the government, in responding to
the attacks, is violating the constitutional rights of the hun-
dreds of persons whom it has detained in connection with its
terrorism investigation—by, as the plaintiffs allege, detaining
them mainly because of their religion or ethnicity, holding
them in custody for extended periods without charge, or
preventing them from seeking or communicating with legal
counsel. The government claims that the detainees have
access to counsel and freedom to contact whomever they
wish, *see* Op. at 5, but the public has a fundamental interest
in being able to examine the veracity of such claims. Just as
the government has a compelling interest in ensuring citizens'
safety, so do citizens have a compelling interest in ensuring

that their government does not, in discharging its duties, abuse one of its most awesome powers, the power to arrest and jail.

Second, while the governmental interests in this case may be uniquely compelling, the legal principles that govern its resolution are not at all unique. The court's opinion emphasizes the national-security implications of the September 11 investigation, but as the government conceded at oral argument, this case is not just about September 11. The law that governs this case is the same law that applies whenever the government's need for confidentiality in a law enforcement investigation runs up against the public's right to know "what [its] government is up to." *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (internal quotation marks omitted). In all such situations, FOIA fully accommodates the government's concerns about the harms that might arise from the release of information pertaining to its investigations. To be sure, the statute strongly favors openness, since Congress recognized that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). But Congress also recognized that "legitimate governmental and private interests could be harmed by release of certain types of information." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (internal quotation marks omitted). It therefore "provided . . . specific exemptions under which disclosure could be refused," *id.*, including the four exemptions relevant to this case: Exemption 7(A), for information that "could reasonably be expected to" interfere with ongoing law enforcement efforts, 5 U.S.C. § 552(b)(7)(A); Exemptions 7(C) and 7(F), for information that "could reasonably be expected to" unjustifiably compromise an individual's privacy or physical safety, *id.* § 552(b)(7)(C), (b)(7)(F); and Exemption 3, for information that other statutes exempt from disclosure, *id.* § 552(b)(3). But " 'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.' " *John Doe Agency*, 493 U.S. at 152

(quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). Accordingly, courts must "narrowly construe[ ]" the exemptions, and "the burden is on the agency to sustain its action." *Id.* (internal quotation marks and citations omitted). The government may in some situations withhold entire categories of records from disclosure, as it seeks to do here by withholding names and other information pertaining to all terrorism-investigation detainees. In order to sustain its burden, however, the government must demonstrate that "the range of circumstances included in the category 'characteristically support[s] an inference' that the statutory requirements for exemption are satisfied." *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 893 (D.C. Cir. 1995) (citing *United States v. Landano*, 508 U.S. 165, 176–80 (1993)).

The third principle relates to the level of deference we owe the government. Invoking the "heightened deference to the judgments of the political branches with respect to matters of national security," *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001), the government refuses to identify the specific categories of information that would actually interfere with its investigation, but rather asks us simply to trust its judgment. This court obeys, declaring that "the judiciary is in an extremely poor position to second-guess the executive's judgment in this area of national security." Op. at 15. But requiring agencies to make the detailed showing FOIA requires is not second-guessing their judgment about matters within their expertise. And in any event, this court is also in an extremely poor position to second-guess the legislature's judgment that the judiciary must play a meaningful role in reviewing FOIA exemption requests. Neither FOIA itself nor this circuit's interpretation of the statute authorizes the court to invoke the phrase "national security" to relieve the government of its burden of justifying its refusal to release information under FOIA.

To begin with, I think it not at all obvious that we owe heightened deference to the government in this case. Citing the legislative history of the 1974 amendments to FOIA's Exemption 1, 5 U.S.C. § 552(b)(1), the exemption for nation-

al-security matters, we have held that in evaluating Exemption 1 claims, " 'substantial weight' is to be accorded to detailed agency affidavits setting forth the basis for exemption." *Weissman v. CIA*, 565 F.2d 692, 697 n.10 (D.C. Cir. 1977); *see also* S. REP. NO. 93–1200, at 12 (1974) (" '[T]he conferees recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse effects might occur as a result of public disclosure of a particular classified record. Accordingly, the conferees expect that the federal courts, in making *de novo* determinations in section 552 (b)(1) cases under the Freedom of Information law, will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.' "). We have also extended this heightened deference to cases involving Exemption 3 as it incorporates the National Security Act of 1947, which requires the CIA Director to protect "intelligence sources and methods" from unauthorized disclosure, 50 U.S.C § 403–3(c)(7). *E.g.*, *Halperin v. CIA*, 629 F.2d 144 (D.C. Cir. 1980) (National Security Act); *Weissman*, 565 F.2d 692 (Exemption 1 and National Security Act). The government, however, relies on neither Exemption 1 nor the National Security Act in this case, and contrary to the court's suggestion, *see* Op. at 15, we have never held that such heightened deference is also appropriate in Exemption 7 cases. Indeed, in *Weissman*, which the court cites for the proposition that "we owe the same deference under Exemption 7(A) in appropriate cases," we found Exemption 7 inapplicable in the case of the CIA's investigation into the FOIA requester's background "except under special collateral circumstances," for instance, to protect the identities of FBI personnel named in requested materials. We instead focused on the deference owed the agency under Exemption 1, as well as Exemption 3 as it incorporates the National Security Act. 565 F.2d at 694–96, 698 & n.15.

In any event, the government's case fails even under the heightened deference we have applied in Exemption 1 and National Security Act cases. No matter the level of deference, our review is not "vacuous." *Pratt v. Webster*, 673 F.2d

408, 421 (D.C. Cir. 1982). Even when reviewing Exemption 1's applicability to materials classified in the interest of national security, we have made clear that no amount of deference can make up for agency allegations that display, for example, a "lack of detail and specificity, bad faith, [or] failure to account for contrary record evidence," since "deference is not equivalent to acquiescence." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). By accepting the government's vague, poorly explained allegations, and by filling in the gaps in the government's case with its own assumptions about facts absent from the record, this court has converted deference into acquiescence.

With these principles in mind, I examine each of the government's arguments for withholding the detainee information. Part II explains why Exemption 7(A), which forms the basis of the court's holding, cannot justify the government's refusal to disclose the bulk of the requested information about the detainees. Part III shows why the government's alternative arguments under Exemptions 7(C), 7(F), and 3 as it incorporates Federal Rule of Criminal Procedure 6(e) likewise fail. Finally, Part IV demonstrates why, on the basis of the record before us, the government has no basis under any exemption for withholding the names of the detainees' attorneys.

## II.

Although FOIA permits agencies to craft rules exempting certain categories of records from disclosure under Exemption 7(A) instead of making a record-by-record showing, *see Robbins Tire*, 437 U.S. at 236, an agency's ability to rely on categorical rules has limits. Specifically, the government must divide information it seeks to withhold into "categories . . . [that are] sufficiently distinct to allow a court to grasp 'how each . . . category of documents, if disclosed, would interfere with the investigation.'" *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986) (quoting *Campbell v. Dep't of Health & Human Servs.*, 682 F.2d 256, 265 (D.C. Cir. 1982)). An acceptable category is

"functional," that is, it "allows the court to trace a rational link between the nature of the document and the alleged likely interference." *Id.*; *see also Nation Magazine*, 71 F.3d at 893 ("There are limits . . . to when categorical rules may be employed. Only when the range of circumstances included in the category 'characteristically support[s] an inference' that the statutory requirements for exemption are satisfied is such a rule appropriate.").

Although I have no doubt that some of the requested information is exempt from FOIA's mandatory disclosure requirement, the court treats disclosure as an all-or-nothing proposition, repeatedly emphasizing the breadth of the plaintiffs' request—the fact that they seek the names and other information pertaining to "every single individual detained in the course of the government's terrorism investigation," Op. at 17—as a justification for accepting the government's own very broad, categorical refusal to release the bulk of the requested information. This all-or-nothing approach runs directly counter to well-established principles governing FOIA requests. Nothing in the statute requires requesters to seek only information not exempt from disclosure. To the contrary, the government bears the burden of reviewing the plaintiffs' request, identifying functional categories of information that are exempt from disclosure, and disclosing any reasonably segregable, non-exempt portion of the requested materials. 5 U.S.C. § 552(b). The government fails to satisfy that burden in this case, for the range of circumstances included in the government's exemption request do not "characteristically support" an inference that the information would interfere with its terrorism investigation.

In support of its exemption request, the government offers declarations from two senior officials with responsibility for the terrorism investigation. One of those declarations, by Dale L. Watson, a Federal Bureau of Investigation official charged with supervising the investigation, was prepared not for this case, but for cases involving the closure of deportation hearings. *See N. Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002), *cert. denied*, 2003 WL 1191395 (May 27, 2003); *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002). Watson's declaration thus speaks not to the harm

that would flow from disclosing detainees' names or other information, but instead to the harm that would flow from publicly airing evidence about particular detainees at such a hearing—i.e., "what evidence led to the detention of each individual," "[i]nformation about how any given individual entered the country," and "what evidence the United States has against members of a particular cell." Watson Decl. ¶¶ 12–13. Plaintiffs in this case request no such information. The court nevertheless relies on the Watson declaration, as well as *North Jersey Media Group*, *see* Op. at 22–23, despite the fact that neither has anything to do with the release of detainee names.

The other declaration, by Department of Justice Terrorism and Violent Crime Section chief James S. Reynolds, does in fact outline the harms that might result from release of some detainee names. But it does not support the government's request for a 7(A) exemption, since that request treats all detainees the same, even though Reynolds tells us that the only common thread among the detainees is that they were "originally questioned because there were indications that they might have connections with, or possess information pertaining to, terrorist activity against the United States." Reynolds Decl. ¶ 10; *see also id.* ¶¶ 27, 36. As Reynolds himself acknowledges, this group includes some detainees who have turned out to be innocent of any involvement with terrorist activity and have "no information useful to the investigation." *Id.* ¶ 36.

Ignoring this important concession, the court declares that "[t]he clear import of the declarations is that many of the detainees have links to terrorism"—which the court considers "no surprise given that the detainees were apprehended during the course of a terrorism investigation, and given that several detainees have been charged with federal terrorism crimes or held as enemy combatants." Op. at 21. The court's approach is unconvincing for two reasons.

To begin with, it rests on what seems to be a faulty assumption about facts not in evidence. As of November 5, 2001, the last time the government released a tally, there

were 1,182 detainees. *See* Dan Eggen & Susan Schmidt, *Count of Released Detainees Is Hard to Pin Down*, WASH. POST, Nov. 6, 2001, at A10 (quoting Justice Department spokeswoman Mindy Tucker). Nothing in the record tells us how many of those 1,182 detainees have been charged with federal terrorism crimes or held as enemy combatants. What little information the record does contain, however, suggests that the number may be relatively small. A list of federally charged detainees attached to the government's motion for summary judgment reports that as of the time this suit was filed, only one detainee had been criminally charged in the September 11 attacks and only 108 detainees had been charged with any federal crime—primarily violations of anti-fraud statutes. Reynolds Decl. ¶ 27; Def. Mot. for Summary Judgment, Ex. 8.

In any event, the court concedes the point—even if "many" of those "apprehended during the course of a terrorism investigation" have links to terrorism, not *all* of them do. As the court itself notes, the declarations establish that many of the INS detainees were held because law enforcement agents determined in the course of questioning them that they were in violation of federal laws; only " 'in some instances' " did agents "also determine[ ] that they had links to other facets of the investigation." Op. at 21 (quoting Reynolds Decl. ¶ 10). Furthermore, although the court assumes that all those detained on material witness warrants "have relevant knowledge about the terrorism investigation" because a federal judge issues such warrants "based on an affidavit stating that the witness has information relevant to an ongoing criminal investigation," Op. at 20, that assumption seems unwarranted given the government's concession that "it may turn out that these individuals have no information useful to the investigation," Reynolds Decl. ¶ 36.

The government gives us no reason to think that releasing the names of these innocent detainees could interfere with its investigation. Indeed, the government never really asks us to believe that disclosure of the names of innocent persons having no knowledge of terrorist activity would in any way

impede its ability to gather information from those who do have such knowledge. Instead, it asserts that "a detainee who knows his name will be made public may be deterred from cooperating now or in the future for fear of retaliation by terrorist organizations against him or his family and associates." Reynolds Decl. ¶ 15. Although the court accepts this argument, Op. at 19, it is ultimately not an argument for withholding detainees' names, but rather for withholding the names of people who have information that might be helpful to law enforcement officials. These are two different categories of people, for as Reynolds acknowledges, many detainees have no information to provide. Reynolds Decl. ¶ 36. These two groups thus merit different treatment. In fact, several statutory provisions address precisely the problem the government identifies, but all of them are aimed at protecting the identities of those people who provide information, not people the government questions because it thinks they *might* have information but who turn out not to. FOIA Exemption 7(A) protects the identities of witnesses where disclosure might pose a risk of interference in the form of witness intimidation or coercion, *Robbins Tire*, 437 U.S. at 239–40; FOIA Exemption 7(D) protects the identities of sources who choose to provide information to law enforcement agents on a confidential basis, 5 U.S.C. § 552(b)(7)(D); and the National Security Act protects the identity of intelligence sources in order to prevent those sources from "clos[ing] up like a clam," *CIA v. Sims*, 471 U.S. 159, 172 (1985) (internal quotation marks omitted). The government can and should rely on these provisions to protect the names of detainees who provide information to law enforcement agents or whom the government believes will be able to provide such information in the future. The government may not, however, preemptively withhold the identities of innocent detainees who do not now, and may never, have any information of use to the terrorism investigation.

The only argument that could conceivably support withholding innocent detainees' names is the assertion that disclosure of the names "*may* reveal details about the focus and

scope of the investigation and thereby allow terrorists to counteract it." Reynolds Decl. ¶ 16 (emphasis added). That Reynolds believes these harms *may* result from disclosure is hardly surprising—anything is possible. But before accepting the government's argument, this court must insist on knowing whether these harms "*could reasonably be expected to*" result from disclosure—the standard Congress prescribed for exemption under 7(A). Nothing in Reynolds's declaration suggests that these harms are in fact reasonably likely to occur.

To begin with, Reynolds never explains how a list of names of persons unknown to terrorist organizations would tell the terrorists anything at all about the investigation, much less allow them to "map [its] progress." *Id.* For example, if the government tells us that it detained men named Mohammed Mubeen, Osama Elfar, Ghassan Dahduli, Fathi Mustafa, Nacer Fathi Mustafa, and Hady Omar, Jr., none of whom has any connection to terrorist organizations, *see* Amy Goldstein, *A Deliberate Strategy of Disruption: Massive, Secretive Detention Effort Aimed Mainly at Preventing More Terror*, WASH. POST, Nov. 4, 2001, at A1, what could that information possibly tell terrorists about the government's investigation? Though Reynolds's declaration provides no answer, the court speculates that the names of these innocent detainees could be valuable to terrorist organizations because "[s]uch detainees could be acquaintances of the September 11 terrorists, or members of the same community groups or mosques." Op. at 19. That may well be true in some cases, but if it is, Reynolds should tell us so under oath, thus providing a record basis for the government to claim an exemption for those detainees who pose such concerns. But the court's speculation, supported only by a newspaper article describing a single detainee who attended a mosque that two terrorism suspects also attended, *see id.* (citing Rachel L. Swarns, *Muslims Protest Monthlong Detention Without a Charge*, N.Y. TIMES, April 20, 2003, at A16), falls far short of satisfying the government's burden under FOIA.

The government's failure to provide an adequate explanation is all the more glaring given that the detainees represent

only a subset—and quite possibly a very small subset—of persons questioned in connection with this investigation. Reynolds Supp. Decl. ¶ 2. As a result, even if releasing detainee names were to provide some insight into the terrorism investigation, that insight would be limited. Releasing the names of the detainees, but not the names of those questioned in connection with the investigation, can paint only a partial—and possibly misleading—picture of the government's investigative strategy. For example, if the government detains two people in Detroit but questions a thousand in Chicago, wouldn't release of the detainee information wrongly lead terrorist organizations to believe that the government was focusing on Detroit, not Chicago?

The second failing in both the government's request and the court's analysis is that they treat all detainee information the same, despite the fact that each item of information that plaintiffs seek about the detainees—names, attorneys' names, dates and locations of arrest, places of detention, and dates of release—is clearly of very different value to terrorists attempting to discern the scope and direction of the government's investigation. Although the Reynolds declaration tells us that "releasing the names of the detainees who may be associated with terrorism and their place and date of arrest would reveal the direction and progress of the investigations," Reynolds Decl. ¶ 16, it does not tell us, for example, whether releasing the detainees' names and dates of arrest, but not their places of arrest—or even releasing the dates of arrest alone—would involve the same danger. The Reynolds declaration, moreover, contains no justification at all for withholding dates of release. Indeed, the government has already disclosed the release dates of detainees who had been held on federal criminal charges. *Id.* ¶ 8. This information may seem unimportant, but from the FOIA requesters' point of view, it could be highly relevant to the question of how the government is treating the persons it has detained. Taken together, arrest and release dates can tell the public how long persons have been detained, raising concerns about possible constitutional violations. *See* Appellees' Br. at 27.

The government's allegations of harm are also undercut by the fact that it has itself provided several other means by which this information can become public. Not only do detainees remain free to inform whomever they choose of their detention, Reynolds Decl. ¶ 23, but on numerous occasions since September 11, the government itself has disclosed precisely the kind of information it now refuses to provide under FOIA. For example, on April 17, 2002, the government announced the arrest of Issaya Nombo, whom government officials said they suspected of connections to terrorism, although he was arrested on immigration charges. Officials revealed Nombo's name and the date and place of his arrest. Philip Shenon, *African Held After Name Is Left in Cave*, N.Y. TIMES, Apr. 18, 2002, at A15. At a June 10, 2002 press conference, the Attorney General announced the arrest of one Abdulla Al Muhajir, born José Padilla, for suspected terrorism involvement, revealing not only Al Muhajir's two names, but also the date and place of his arrest, and the events leading to his capture. Attorney General Ashcroft News Conference, June 10, 2002, *available at* http:/www.usdoj. gov/ag/speeches/2002/061002agtranscripts.htm. And on July 26, 2002, government officials announced they were holding Mohammad Mansur Jabarah on a material witness warrant after his arrest in connection with a terrorist plot in Singapore. William K. Rashbaum, *Captured Qaeda Member Gives Details on Group's Operations*, N.Y. TIMES, July 27, 2002, at A8.

Nothing in the record explains why the government's concerns about interference with the investigation do not apply with respect to detainees such as Abdulla Al Muhajir, Issaya Nombo, and Mohammad Mansur Jabarah, but do nevertheless apply with respect to the other detainees. In its reply brief, the government explains that it may have strategic reasons for disclosing certain information, since its disclosures to date "have identified specific individuals in a manner unlikely, in the view of the law enforcement experts, to impede the progress of the investigation." Appellant's Reply Br. at 18. While this may well be so, it is an argument of counsel, and though the court accepts it, FOIA requires that

the agency—not counsel—explain such judgments under oath. The reason for this requirement is clear: We owe deference to agency expertise, not to lawyers defending the agency in litigation. *See, e.g.*, *Church of Scientology v. IRS*, 792 F.2d 153, 165–166 (D.C. Cir. 1986) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). If there are legitimate investigative reasons for releasing the names of some detainees, but not others, then Mr. Reynolds or others responsible for the terrorism investigation should explain those reasons under oath—in an in camera affidavit, if necessary to protect the information—and that explanation would probably warrant judicial deference.

It is true, as the court points out, that the Supreme Court in *CIA v. Sims* acknowledged "the political realities of intelligence operations in which, among other things, our Government may choose to release information deliberately to 'send a message' to allies or adversaries" when it upheld the CIA's right to withhold intelligence information even if the CIA has already released some part of it. 471 U.S. at 180. Unlike this court, however, the Supreme Court did not simply assume it understood the government's strategy; it reached its conclusion on the basis of the CIA Director's affidavit explaining that strategy. *Id.* at 180 & n.24. The record in this case contains no similar explanation. Moreover, counsel's argument suggests that the government itself differentiates among detainees on a case-by-case basis for purposes of assessing how disclosure might harm its investigation. If the government itself makes such distinctions in deciding what information to release, then why, particularly in light of FOIA's exacting standards, doesn't it make those distinctions in its exemption request before this court?

By asking these questions, the court would not, as it warns, be "second-guessing" the government's judgments about matters of national security. Op. at 15. It would, rather, be doing the job Congress assigned the judiciary by insisting that the government do the job Congress assigned to it: provide a rational explanation of its reasons for claiming exemption from FOIA's disclosure requirements.

### III.

Because the court concludes that Exemption 7(A) applies to the government's entire request, it never addresses the government's alternative arguments under Exemptions 7(C), 7(F), and 3. In my view, none of these provisions supports the government's refusal to disclose the detainee information either.

*Exemption 7(C)*

Exemption 7(C) permits the government to withhold law enforcement records where their release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Like Exemption 7(A), the application of Exemption 7(C) is subject to a set of well-established standards. Because the statute refers not to invasions of privacy generally, but to "unwarranted" invasions of privacy, courts evaluating claims for 7(C) exemption must do more than simply identify a privacy interest that will be compromised by disclosure of information. Instead, they must "balance the public interest in disclosure against the interest Congress intended the Exemption to protect." *Reporters Committee*, 489 U.S. at 776.

Relying on our decision in *Nation Magazine*, the government argues that the detainees have " 'an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation,' " and that these privacy concerns are "particularly acute given the nature and magnitude of the September 11 attacks." Appellant's Br. at 39–40 (quoting *Nation Magazine*, 71 F.3d at 894). This argument is unconvincing. For one thing, if the government is so concerned with the detainees' privacy, why has it released so much information about them? What about Abdulla Al Muhajir's privacy, or Issaya Nombo's, or Mohammad Mansur Jabarah's? Nothing in the Reynolds declaration explains how the government's press conferences releasing the names of these detainees demonstrate any respect for their privacy.

In any event, we have never held that individuals who have been not only investigated, but also arrested and jailed, have a similar privacy interest in avoiding "unwarranted association with criminal activity or reputational harm." *Nation Magazine*, 71 F.3d at 894. Even though being arrested subjects a person suspected of criminal activity to embarrassment and potentially more serious reputational harm, the law is nevertheless clear that no right of privacy "is violated by the disclosure of 'an official act such as an arrest.'" *Am. Fed'n of Gov't Employees, AFL-CIO v. Dep't of Housing & Urban Dev.*, 118 F.3d 786, 794 (D.C. Cir. 1997) (quoting *Paul v. Davis*, 424 U.S. 693, 713 (1976)).

To be sure, detainees may have a unique interest in avoiding association with the crimes of September 11. Even so, that interest is clearly outweighed by the public interest in knowing whether the government, in investigating those heinous crimes, is violating the rights of persons it has detained. And while FOIA asks only whether the public interest in disclosure outweighs the private interest in secrecy, it bears noting that the private interests in this case weigh on both sides of the balance: Plaintiffs' request for disclosure of the detainees' names seeks to vindicate not only the public's right to know what its government is up to, but also the detainees' own rights, including the right to counsel and to speedy trial.

Nothing in *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991), requires a different result. *SafeCard* establishes that names appearing in law enforcement files will often fall within the scope of Exemption 7(C), since records containing such information are generally far less probative of an agency's behavior or performance than of the behavior of the persons whose names appear in the records. *Id.* at 1205; *see also Nation Magazine*, 71 F.3d at 895 ("In some, perhaps many, instances where a third party asks if an agency has information regarding a named individual in law enforcement files, the cognizable public interest in that information will be negligible; the requester will be seeking records about a private citizen, not agency conduct."). The *SafeCard* court therefore formulated a categorical rule exempting disclosure of such information unless the requester can show (1) compel-

ling evidence that the agency is engaged in illegal activity, and (2) that the information is necessary to confirm or refute that evidence. *SafeCard*, 926 F.2d at 1205–06. Plaintiffs' FOIA request satisfies both elements of this rule.

To begin with, this case does not implicate *SafeCard*'s concern that disclosure of names in law enforcement files will generally shed less light on the government's behavior than it does on the behavior of private citizens. In *SafeCard*, the FOIA requester sought information relating to organizations and individuals whom the SEC had suspected of manipulating the requester's stock and who might be witnesses or litigants in the SEC's investigations. 926 F.2d at 1200, 1205. Similarly, in many other Exemption 7(C) cases, FOIA requesters seek names in law enforcement files primarily in order to attack their convictions or otherwise exculpate themselves—a "personal stake" in disclosure that "does not count in the calculation of the public interest." *Oguaju v. United States*, 288 F.3d 448, 450 (D.C. Cir. 2002); *see also Billington v. United States Dep't of Justice*, 233 F.3d 581, 582 (D.C. Cir. 2000). Here, in contrast, plaintiffs have little if any personal stake in their FOIA request, which aims solely to glean information relating to the government's conduct of its terrorism investigation and its treatment of the detainees. Designed to "shed[ ] light on an agency's performance of its statutory duties," this request implicates precisely the kind of public interest lying at the heart of Exemption 7(C)'s balancing test. *Reporters Committee*, 489 U.S. at 773.

Moreover, plaintiffs offer ample evidence of agency wrongdoing. The record includes hundreds of pages of newspaper articles, human rights reports, and congressional testimony reporting alleged governmental abuses such as holding detainees for long periods without allowing them to seek or communicate with counsel and without charging them. *See, e.g.*, Alison Leigh Cowen, *Detainees' Lawyers Complain of Unfair Treatment*, N.Y. TIMES, Oct. 21, 2001, at B1; Richard A. Serrano, *Many Held in Terror Probe Report Rights Being Abused*, L.A. TIMES, Oct. 15, 2001, at A1; Amnesty International, *Amnesty International's Concerns Regarding Post September 11 Detentions in the USA*, *available at*

http://web.amnesty.org/aidoc/aidoc_pdf.nsf; Human Rights Watch, *Presumption of Guilt: Human Rights Abuses of Post–September 11 Detainees, available at* http://www.hrw. org/reports/2002/us911/USA0802.pdf; *Department of Justice Oversight: Preserving Our Freedoms While Defending Against Terrorism: Hearing Before the Senate Judiciary Comm.*, 107th Cong. (2001) (statement of Gerald H. Goldstein, Attorney, National Ass'n of Criminal Defense Lawyers), *available at* http://judiciary.senate.gov/hearing.cfm?=28; *id.* (statement of Michael Boyle, Attorney, American Immigration Lawyers Ass'n). To be sure, none of this evidence has been tested and proved in a court of law. But *SafeCard* requires only "compelling" evidence—not tested evidence, and not even evidence that would be admissible at trial. If hundreds of pages of first-hand reports of governmental abuses do not qualify as "compelling" evidence sufficient to justify an investigation into the government's conduct, then I cannot imagine what would. After all, FOIA's purpose, as *SafeCard* recognizes, is to allow the public access to records necessary to ascertain whether the government has acted illegally. If requesters already had tried and tested proof of such illegal activity, then resort to FOIA would be unnecessary. History, moreover, is full of examples of situations in which just these sorts of allegations led to the discovery of serious government wrongdoing—from Teapot Dome in the 1920s to the FBI's COINTELPRO counterintelligence program in the 1960s to Watergate in the 1970s.

In short, by interpreting *SafeCard* to require anything more than compelling "allegations of illegal agency activity," *Nation Magazine*, 71 F.3d at 896, the government would transform the *SafeCard* test into a categorical ban on the disclosure of names contained in law enforcement records. That result finds justification in neither FOIA nor our cases interpreting Exemption 7(C). *See Nation Magazine*, 71 F.3d at 896 (holding that a blanket exemption for all names in law enforcement records "would be contrary to FOIA's overall purpose of disclosure, and thus is not a permissible reading of Exemption 7(C)"); *Stern v. FBI*, 737 F.2d 84 (D.C. Cir. 1984) (ordering the disclosure of the name of a high-ranking FBI

official in internal reports concerning the agency's investigation of a cover-up).

Finally, plaintiffs need the information they request to confirm or refute the compelling evidence of agency wrongdoing—the *SafeCard* test's second requirement. While it is true that a list of names alone would shed no light on whether the government has respected detainees' constitutional rights, plaintiffs need the names in order to gather information about the government's treatment of the detainees. Appellees' Br. at 30. In this respect, plaintiffs' request differs from the vast majority of FOIA requests for information concerning named individuals in law enforcement files, where the only plausible public interest is knowing to what extent an agency believed the named individuals were involved in illegal activity. *Cf. Rosenfeld v. United States Dep't of Justice*, 57 F.3d 803, 812 (9th Cir. 1995) (holding that Exemption 7(C) does not justify withholding the identities of persons investigated for subversive activities in FBI files, where the names would make it possible to determine whether the FBI had investigated student activists for participating in political protests by comparing the FBI's investigations to a roster of a student activist group's leadership).

*Amici* Washington Legal Foundation and the Jewish Institute for National Security Affairs contend that release of the information is not necessary to evaluate whether the government is operating within the bounds of the law in detaining persons in connection with its terrorism investigation, since the public has other means of obtaining the information: Individual detainees can bring individual lawsuits, the Department's Inspector General has investigated allegations of misconduct, and media reports and congressional investigations all tell the public what its "government is up to." Washington Legal Found. Br. in Support of Appellant at 17. But *Amici*'s argument has no basis in FOIA. If Congress had intended for individual lawsuits, internal investigations, or newspaper reports to relieve the government of its obligations under FOIA, then it would have expressed that intent in the law.

*Exemption 7(F)*

The government next invokes Exemption 7(F), which permits withholding law enforcement records where their release "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Here again, the government's evidence fails to establish that the entire range of records encompassed in the plaintiffs' FOIA request "could reasonably be expected" to endanger the detainees.

The government's declarations tell us only that (1) "[d]etainees who are, in fact[,] affiliated with a terrorist group may be perceived by such groups as informants for the United States and be killed to preclude their future cooperation," Reynolds Decl. ¶ 37, and (2) "[i]f prisoners learn that an individual who was detained as a result of the investigation emanating from the September 11 attacks is in their own prison facility, some may try to retaliate against this individual," *id.* ¶ 29. The government tells us nothing about what threat, if any, disclosure would pose to detainees who are neither affiliated with a terrorist group nor currently imprisoned. And the government's own disclosures again undermine its assertions about detainees' safety. Plaintiffs point out that the Justice Department Inspector General himself named two of the detention centers used to house the terrorism investigation detainees, a fact that the government neither denies nor explains. Appellees' Br. at 27. Again, the government may have had reasons for disclosing the names of only these two detention centers, but nothing in the Reynolds declaration tells us what those reasons might be.

*Exemption 3*

Finally, the government invokes Exemption 3, which exempts from disclosure matters that are "specifically exempted from disclosure by statute . . ., provided that such statute . . . requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). According to the government, Exemption 3, which encompasses Federal Rule of Criminal Procedure 6(e)'s

prohibition on the disclosure of "matters occurring before the grand jury," *see Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 867–68 (D.C. Cir. 1981), excuses it from disclosing the names of detainees held on material witness warrants, since "each of these warrants was issued to procure a witness's testimony before a grand jury," Reynolds Second Supp. Decl. ¶ 4. As such, the government contends that Exemption 3 provides a ground for nondisclosure independent of Exemption 7.

Rule 6(e) forbids disclosure of "not only what has occurred and what is occurring, but also what is likely to occur" before a grand jury, including disclosure of witnesses' identities. *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500 (D.C. Cir. 1998). Therefore, the names of persons detained on material witness warrants who have actually testified before grand juries are unquestionably exempt from disclosure. The government, however, insists that Exemption 3 also covers the names of material witness detainees who have neither testified before grand juries nor are scheduled to do so, as well as the names of detainees who were released without ever having testified, because all of these detainees were originally detained in order to "procure [their] testimony before a grand jury." Reynolds Second Supp. Decl. ¶ 4.

Saying that the material witness detainees were held in order to secure their testimony is quite different from saying that their testimony is "likely to occur" before a grand jury. Indeed, the record indicates that at least seven material witnesses have been released without testifying before a grand jury, so in their cases, it seems more accurate to say that their testimony is quite *unlikely* to occur before a grand jury. *See Indiana Men Ordered to Testify to Return to Evansville*, Assoc. Press, Oct. 25, 2001. Furthermore, although current detainees may be, on the whole, somewhat more likely to testify before grand juries, their testimony is not necessarily "likely to occur" for purposes of Rule 6(e). We have said that the "likely to occur" language must be read sensibly: It does not authorize the government to draw "a veil of secrecy ... over all matters occurring in the world

that happen to be investigated by a grand jury." *In re Sealed Case*, 192 F.3d 995, 1001–02 (D.C. Cir. 1999) (internal quotation marks and citation omitted). Accordingly, we have made clear that Rule 6(e) covers "testimony *about to be* presented to a grand jury" (emphasis added)—hence the "likely to occur" language—but does not cover government investigations that merely parallel grand jury investigations. *Id.* at 1002–03. Because the government fails to show that all material witness detainees are likely to testify before grand juries, it may not, on this record, withhold their names under Rule 6(e). To hold otherwise would convert this circuit's carefully crafted standard into an absolute rule that would permit the government to keep secret the name of any witness whom it ever thought might testify at a grand jury proceeding, or who might testify at some indefinite point in the future. Neither Rule 6(e) nor the law of this circuit justifies that result.

## IV.

No part of the government's exemption request better illustrates its infirmities than its refusal to disclose the names of the detainees' attorneys. Essentially rehashing its arguments for withholding the names of the attorneys' clients, the government argues—and the court agrees, *see* Op. at 23—that releasing attorneys' names would interfere with the terrorism investigation and would compromise the detainees' privacy interests, since releasing a list of attorneys "may facilitate the identification of the detainees themselves." Reynolds Decl. ¶ 18. The government also claims to be withholding the attorneys' names for their own good, warning that attorneys identified as representing individuals detained in connection with the terrorism investigation "run the risk that they will be subjected to harassment or retaliation in their personal as well as professional lives." Reynolds Decl. ¶ 26.

Both parts of this argument are not only profoundly wrong, but also reflect a complete misunderstanding of the nature of this country's legal profession. In the first place, attorneys'

names are quite clearly not a proxy for the names of their clients. Indeed, recognizing that knowledge of the lawyer's identity does not inexorably lead to identifying the client, ethical rules forbid lawyers from identifying their clients without their consent, except in extraordinary circumstances. Rule 1.6 of the *Model Rules of Professional Conduct* provides that absent extraordinary circumstances, "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives consent after consultation"—a prohibition that generally includes disclosure of a client's identity. *See* CTR. FOR PROF'L RESPONSIBILITY, AM. BAR ASS'N, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT 83 (4th ed. 1999). Because the decision ultimately belongs to the detainees and not their lawyers, providing a list of the lawyers' names would do little more to facilitate identification of the detainees than the government's current policy of allowing the detainees to identify themselves to the media and to whomever else they choose.

Even assuming that releasing attorneys' names will somehow facilitate identification of the detainees, the court's all-or-nothing approach again impermissibly shifts the burden of identifying exempt information from the government to plaintiffs. The government's Exemption 7(A) argument for withholding lawyers' names thus fails for the same reason as its 7(A) argument for withholding the names of all detainees. How would releasing the names of attorneys representing innocent clients with no connection to terrorist activities interfere with the government's terrorism investigation? Neither the court nor the government provides an explanation.

The government's second argument fares no better. The notion that the government must withhold the attorneys' names for their own good is flatly inconsistent with lawyers' roles as advocates and officers of the court in our fundamentally open legal system. Having voluntarily assumed this public role, lawyers have little expectation of anonymity. I, for one, know of no lawyer who has ever asked for the kind of protection the government now asserts on behalf of the detainees' lawyers. Moreover, I have no doubt that lawyers

will represent individuals associated with the terrorism investigation even without the protection the government urges. As Judge Kessler noted in her opinion in this case, the history of our profession is full of examples of brave men and women who have taken on unpopular causes in the interest of justice. *Center for Nat'l Sec. Studies v. Dep't of Justice*, 215 F. Supp. 2d 94, 109 (D.D.C. 2002). Not only do lawyers regularly represent persons accused of terrible and highly publicized crimes against individuals, but many of this country's most prominent and well-respected lawyers have defended persons accused of heinous crimes against the state, from Aaron Burr to Nazi saboteurs to Soviet spies, as well as persons merely suspected of a propensity to commit such crimes, such as Japanese internees in World War II.

In addition, the government completely fails to substantiate its concerns about releasing attorneys' names. The government insists that "[i]n light of the brutality of the acts committed against the United States, even the mere possibility of retaliation against these lawyers justifies withholding their identities." Reynolds Decl. ¶ 38. FOIA, of course, does not allow the government to withhold information based on "mere possibilities." And the Reynolds declaration fails to establish that retaliation is reasonably likely. Indeed, if the government is so worried about retaliation against lawyers, why did it release a comprehensive list of attorneys representing federally charged detainees? *See* Def. Mot. for Summary Judgment, Ex. 8. Reynolds provides no answer. And if the risk of retaliation has materialized in the case of these attorneys, Reynolds certainly does not tell us so.

If the government has legitimate concerns about the safety of one or more of the lawyers, FOIA requires it to describe those concerns with reasonable specificity—again in an in camera affidavit, if necessary—and explain why it believes the harms it fears "could reasonably be expected" to occur. Giving appropriate deference to law enforcement expertise, the district court would then be in a position to evaluate the government's concerns and determine whether withholding the attorneys' names under Exemption 7(F)—or some other, less extraordinary measures—are needed to protect the de-

tainees' attorneys. Absent such evidence, however, the government has no basis for its flat refusal to release lawyers' names.

## V.

Although I think it unreasonable to infer that all of the information plaintiffs seek in their FOIA request qualifies for exemption, the government may be able to point to more narrowly defined categories of information that might justify the inference. For example, while nothing in the record supports the government's contention that releasing the names of innocent detainees would harm the investigation, perhaps the government could justify withholding the places of arrest on the ground that such information might provide terrorist organizations with some insight into the government's investigative methods and strategy. I would therefore remand to allow the government to describe, for each detainee or reasonably defined category of detainees, on what basis it may withhold their names and other information.

This "more particularized approach" comports with both "Congress' intent to provide workable rules of FOIA disclosure," *United States v. Landano*, 508 U.S. 165, 180 (1993) (internal quotation marks and citations omitted), and FOIA's ultimate aim: to give the public "access to information about how Government is exercising its trust," at a time when "Government is becoming involved in more and more aspects of every citizen's personal and business life." 112 Cong. Rec. 13654 (1966) (statement of Rep. Rumsfeld). It would also ensure that this court treat FOIA as "a disclosure statute and not as an excuse to withhold information from the public." *Id.*

Rather than hold the government to clearly established standards governing FOIA exemptions, the court sustains the government's vague, ill-explained decision to withhold information, invoking principles of deference and engaging in its own speculation to fill in the gaps in the government's showing. In my view, the court's approach drastically diminishes,

if not eliminates, the judiciary's role in FOIA cases that implicate national-security interests. Congress certainly could have written FOIA that way, but chose instead to require meaningful judicial review of all government exemption claims. If the government thinks that a new, broader FOIA exemption is needed for terrorism cases, it should ask Congress to create one, just as in the wake of September 11 it asked Congress to authorize roving wiretaps of suspected terrorists and to permit detention of non-U.S. citizens suspected of terrorism without specific charges. *See* USA PATRIOT Act, Pub. L. No. 107–56, 115 Stat. 272 (2001). But this court may not change the law in Congress's stead. For all its concern about the separation-of-powers principles at issue in this case, the court violates those principles by essentially abdicating its responsibility to apply the law as Congress wrote it. I dissent.