**19-1577**
*Osen LLC v. United States Central Command*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term 2019

(Argued: March 16, 2020 | Decided: August 10, 2020)

Docket No. 19-1577

OSEN LLC,

*Plaintiff-Appellee,*

v.

UNITED STATES CENTRAL COMMAND,

*Defendant-Appellant.*

————————

Before:

WESLEY, CARNEY, MENASHI, *Circuit Judges.*

Appeal from a judgment of the Southern District of New York (Failla, *J.*), denying in part United States Central Command's ("CENTCOM") motion for summary judgment.

Osen LLC ("Osen") brought this action under the Freedom of Information Act ("FOIA") seeking military investigation records from terrorist attacks that occurred in Iraq between 2004 and 2011.  Applying the official disclosure doctrine, the district court found that CENTCOM could not withhold certain classified images contained in those records, because another component of the Department of Defense ("DoD") had previously disclosed that information.

We disagree.  Although similar images from other, unrelated terrorist attacks have been produced in the past, no component of DoD has ever disclosed

images of the attacks for which Osen seeks records in this case. CENTCOM therefore did not waive its right to withhold the images that Osen requested under the official disclosure doctrine. Further, because we must give substantial weight to CENTCOM's position that disclosure of those classified images will pose a risk to national security, we find that CENTCOM properly withheld the images at issue under the first exemption from FOIA production.

Accordingly, we **VACATE** the judgment in part and **REVERSE** the decision of the district court. We **REMAND** so that the district court may enter an order and judgment consistent with this opinion.

Judge Menashi concurs in a separate opinion.

———————————

> MICHAEL J. RADINE (Gary M. Osen, *on the brief*), Osen LLC, Hackensack, NJ, *for Plaintiff-Appellee*.

> ANDREW E. KRAUSE, Assistant United States Attorney (Christopher Connolly, Assistant United States Attorney, *on the brief*), *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellant*.

———————————

WESLEY, *Circuit Judge*:

Osen LLC ("Osen") has filed a large number of lawsuits on behalf of United States servicemembers and their families against Iran and various Iranian and Western financial institutions. Osen's clients were injured or killed in terrorist attacks that occurred in Iraq between 2004 and 2011; their lawsuits allege that Iran and the defendant financial institutions helped fund, train, and support terrorists responsible for those attacks.

2

To meet its burden of proving Iran's responsibility for the terrorist attacks at issue, Osen sought military investigation records from Department of Defense ("DoD") entities, including United States Central Command ("CENTCOM"). Specifically, Osen sought to confirm the types of explosive weapons used in each attack, reasoning that, if the weapons were too sophisticated for Iraqi terrorists to have manufactured themselves, this demonstrated the terrorists' affiliation with Iran, and by extension, Iran's causal role in the servicemembers' injuries.

Osen brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, arguing that, in response to its request for these military investigation records, CENTCOM improperly withheld, under various FOIA exemptions, documents and information to which Osen believed it was entitled. Upon cross-motions for summary judgment, the United States District Court for the Southern District of New York (Failla, *J.*) determined in relevant part that CENTCOM could not withhold certain classified images because another component of DoD had already officially disclosed the information that those images conveyed.

CENTCOM appealed. For the reasons stated below, we reverse the district court's decision.

## BACKGROUND

Osen is a New Jersey-based law firm that represents hundreds of United States servicemembers and the families of United States servicemembers injured or killed in terrorist attacks that occurred in Iraq between 2004 and 2011. On behalf of these clients Osen has sued the Islamic Republic of Iran and various Iranian and Western financial institutions for allegedly funding, training, and supporting the terrorists responsible for those devastating attacks.

To show that the attacks were committed by Iranian-backed terrorists, Osen intends to argue that the weapons used in the attacks were more sophisticated and destructive than the types of weapons terrorists in Iraq would or could have otherwise obtained themselves, thereby suggesting Iran provided the weapons. One such weapon is called an Explosively-Formed Penetrator ("EFP")—an explosive device that the terrorists used to penetrate armored vehicles and maim the servicemembers inside. Military investigation records contain information and details about weapons used in terrorist attacks. Osen therefore submitted a FOIA request to CENTCOM, seeking "reporting or investigative documents" related to 92 terrorist attacks involving the use of EFPs. J.A. 20–23.

4

CENTCOM is "one of nine combatant commands of the United States armed forces; it directs and enables military operations and activities with allies and partners" within, among other areas, the Middle East. J.A. 118. CENTCOM produced six unclassified documents in response to Osen's FOIA request. Osen thereafter submitted 168 additional FOIA requests to CENTCOM related to numerous different EFP attacks.

One type of record that Osen requested from CENTCOM is called an Army Regulation ("AR") 15-6 investigation report, created by the Army after an incident in which a servicemember is wounded or killed in action. As relevant here, after an EFP attack in Iraq, the military investigates the attack scene, takes pictures of the damaged armored vehicle, and records those images along with its findings in the AR 15-6 investigation report, thus memorializing the damage from the attack.

CENTCOM conducted database searches and found 36 responsive AR 15-6 investigation reports. CENTCOM cannot, however, produce AR 15-6 reports "without the approval of a properly designated release authority" from the Army. J.A. 124, 152. It therefore referred the 36 responsive reports to United States Army Central ("ARCENT")—the Army unit that conducted those investigations—to determine whether to produce the reports to Osen. ARCENT is "an operational-

5

level Army force that exercises administrative control of all U.S. Army forces in the Middle East." J.A. 123. ARCENT has its own FOIA staff and procedures, and it handles FOIA requests independently from CENTCOM. Osen also submitted separate FOIA requests to ARCENT, which were related to its lawsuits against Iran but which Osen does not challenge in this action.

After Osen "receiv[ed] what [it] felt was insufficient production" from CENTCOM, J.A. 104, Osen filed a complaint in federal district court to obtain additional and lesser-redacted records under FOIA. During the district court proceedings, CENTCOM and ARCENT each produced several thousands of pages of documents in response to Osen's first and subsequent FOIA requests, including 14 of the 36 AR 15-6 investigation reports that CENTCOM referred to ARCENT.

Unable to resolve Osen's remaining challenges to still-unproduced documents, the parties eventually filed cross-motions for summary judgment. The district court found that ARCENT's FOIA production to Osen of images showing EFP strike damage from a terrorist attack related to Osen's lawsuits operated as a waiver with respect to CENTCOM's right to withhold similar images from all other terrorist attacks. The district court therefore ordered CENTCOM "to produce the redacted photographs of EFP strikes" from all the attacks at issue.

6

Special App. 32. CENTCOM appealed and claims the order covers "more than 500 pages of classified photographs from numerous distinct attacks." Appellant Br. 13.

## DISCUSSION

This case requires us to determine whether CENTCOM waived its right to withhold classified information from FOIA production under the official disclosure doctrine, and if not, whether CENTCOM properly invoked the first exemption from production under FOIA to withhold the requested information as classified. We review *de novo* a district court's decision on summary judgment in a FOIA case. *See Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009).

"The mandate of [] FOIA calls for broad disclosure of Government records." *CIA v. Sims*, 471 U.S. 159, 166 (1985). It generally provides that "each agency, upon any request for records . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

FOIA does not compel the disclosure of all agency information, however. There are nine exemptions to FOIA's general rule of production, pursuant to which agencies can withhold certain categories of documents or information. *See id.* § 552(b)(1)–(9). Only the first exemption is relevant here. Exemption 1

7

excludes from disclosure material that is "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." *Id.* § 552(b)(1). In other words, Exemption 1 protects information about national security that is classified as secret pursuant to an Executive order.

Pursuant to Executive Order 13,526, information can be classified as secret if "its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security . . . and it pertains to" certain categories of information including "military plans, weapons systems, or operations," and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." Classified National Security Information, Exec. Order No 13,526 §§ 1.2(2), 1.4(a), (g), 75 Fed. Reg. 707, 709 (Dec. 29, 2009).

As relevant to this appeal, Osen challenged CENTCOM's withholdings under Exemption 1 of classified images that show damage caused by EFPs in these terrorist attacks—specifically, the "strike points" where an EFP penetrated an armored vehicle. J.A. 105. Osen relied on several past DoD disclosures of images

8

of EFP damage to argue that CENTCOM waived its right to withhold similar EFP damage images from other attacks under the official disclosure doctrine, which we discuss at length below.[1]

The district court divided the prior disclosures into two categories: (1) the "Prior CENTCOM Disclosures" and (2) ARCENT's FOIA disclosures in this case (to which we refer as "ARCENT's FOIA Production"). Special App. 15, 19.

The Prior CENTCOM Disclosures included (1) CENTCOM's FOIA production in a different case of "clear and close up" EFP strike photographs from a separate and unrelated terrorist attack; (2) a DoD press conference in which agency representatives discussed the dangers of EFPs using an accompanying slide deck with images of EFP damage; (3) a CNN video which displayed "a close-

---

[1] Osen also challenged CENTCOM's decision to withhold information about EFP size under Exemption 1; CENTCOM's redactions to names that Osen claimed identified terrorists under Exemption 6 (*i.e.*, information withheld for privacy reasons, *see* 5 U.S.C. § 552(b)(6)); and the AR 15-6 investigation reports CENTCOM referred to ARCENT that ARCENT had not yet produced. The district court found that CENTCOM waived Exemption 1 under the official disclosure doctrine with respect to the withheld EFP size information. Separately, the district court found that CENTCOM satisfied the requirements to redact names under Exemption 6. Finally, the district court did not find anything awry with CENTCOM's referrals to ARCENT of the AR 15-6 investigation reports. CENTCOM does not challenge the district court's order as to EFP size information on appeal, nor does Osen challenge the district court's order as to CENTCOM's name redactions or the ARCENT referrals; these decisions are therefore not before us for review.

up picture of an EFP strike" that DoD released to the media; and (4) CENTCOM's other disclosures in this case, which Osen argues often reveal EFP strike points. *Id.* at 15–16.

With respect to this category of disclosures, the district court accorded substantial weight to the declaration of CENTOM's Chief of Staff, Major General Terry Ferrell, that "[e]ach individual photograph showing the penetration of armor by EFPs that has been withheld . . . reveals information about the vulnerabilities of American war-fighting equipment." J.A. 156. The district court also accepted CENTCOM's argument that "each attack presents its own specific, individualized factual scenario," and, accordingly, found that prior disclosure of information about one attack does not "categorically waive" the right to withhold information under Exemption 1 for other attacks. Special App. 18.

The district court explained that the Prior CENTCOM Disclosures that concerned EFPs generally or general vulnerabilities of armored vehicles were "too broad" to constitute official disclosures of individual attacks, and that the Prior CENTCOM Disclosures with images of EFP damage from other attacks were "too narrow" to constitute official disclosure of the attacks at issue here. *Id.* at 18–19.

Thus, the district court concluded that the Prior CENTCOM Disclosures did not compel production of withheld images of EFP damage from other attacks.

With respect to ARCENT's FOIA Production, however, the district court found that ARCENT "provide[d] specific photographs connected to a specific attack, with dates and detailed location information" that was at issue in Osen's lawsuits.[2] *Id.* at 21. According to the district court, ARCENT's FOIA Production "provide[d] the precise type of information that General Ferrell suggests would reveal vulnerabilities through an official disclosure"; the district court therefore interpreted ARCENT's FOIA Production as suggesting that ARCENT "made a determination that this type of material does not pose a risk to national security." *Id.* The district court concluded that the images in ARCENT's FOIA Production constituted a subject matter waiver under the official disclosure doctrine and "require[d] disclosure of any similar photographs of EFP strikes withheld by CENTCOM." *Id.*

---

[2] This finding states the obvious. A photograph necessarily memorializes a specific event, frozen in time. Given that fact, it is somewhat confusing how the district court concluded that the photographs ARCENT produced were any different in this respect from other photographs that DoD has produced.

11

## I. Official Disclosure Doctrine

Under the official disclosure doctrine, an agency may not invoke Exemption 1 "to prevent public disclosure when the government has *officially* disclosed the *specific* information being sought." *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 421 (2d Cir. 1989) (emphasis in original). The official disclosure doctrine prohibits an agency from withholding "even properly classified information once the Agency itself has officially disclosed it." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009).

The test we articulated in *Wilson* is a "strict" one: "Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) '[is] as specific as the information previously released,' (2) 'match[es] the information previously disclosed,' and (3) was 'made public through an official and documented disclosure.'" *Id.* (alterations in original) (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)) (citing *Hudson River Sloop Clearwater*, 891 F.2d at 421). All three prongs of the *Wilson* test must be met before an agency will be deemed to have officially disclosed classified information.

Neither we nor the D.C. Circuit (from where the official disclosure doctrine originates) has delineated what a FOIA plaintiff must establish to satisfy the first

or second prong of the *Wilson* test.[3]  Rather, much of the caselaw refers to and analyzes whether "the specific information" has already been produced by the government, as that phrase is used (including in *Hudson River Sloop Clearwater*) to describe a disclosure that triggers the official disclosure doctrine generally, rather

---

[3] The third prong of the *Wilson* test is not at issue in this case.  CENTCOM does not challenge the official nature of any of the disclosures upon which Osen relies in arguing that CENTCOM waived its Exemption 1 rights.  Accordingly, for purposes of this decision, we assume that each of the prior disclosures upon which Osen relies is an "official" disclosure under the third prong of the *Wilson* test.

CENTCOM also does not challenge the district court's finding that any waiver by ARCENT also applies to CENTCOM.  As is relevant to that finding, CENTCOM referred to ARCENT the FOIA decision of whether to produce records that contain EFP strike point images.  Though CENTCOM did not refer the decision on whether to produce *every* document that Osen sought, or even the majority of Osen's requests, CENTCOM and ARCENT nevertheless displayed a telling level of coordination and deference with respect to the decision of whether to disclose this type of information to Osen in this case.  As we discuss further below, there is no difference in the *character* of EFP strike point images across terrorist attacks, regardless of who is the custodian of those images.  In other words, it is logical in this case that ARCENT's disclosure could implicate the official disclosure doctrine for CENTCOM with respect to EFP strike point images, even though each DoD subcomponent has its own FOIA staff and procedures.

This might not be the case in a factually distinct scenario.  As the concurrence suggests, disclosure by one component of an Executive department or agency does not automatically implicate the official disclosure doctrine for another component of the same department or agency.  *Cf.* 5 U.S.C. § 551(1) (defining "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency").  Because neither party has briefed this issue, we decline to comment further, other than to caution against extrapolating from or taking this point out of context, because what constitutes an "agency" under FOIA need not but may be the equivalent of the government entity itself, depending on the facts of the case.

than examining whether information is "as specific as" a prior disclosure, as that phrase is used in the *Wilson* test.

This case demands a more granular approach. We must parse out the first two prongs of the *Wilson* test to determine whether the official disclosure doctrine properly applies to compel the broad finding of waiver that Osen advances and that the district court found.

The phrase "the specific information" logically covers the first two prongs of the *Wilson* test: "the specific information" refers to information that is both "as specific as" and "matches" information previously disclosed. Each serves a distinct purpose. If information is as specific as but does not match previously disclosed information, it cannot be "*the* specific information." The same is true for information that matches a prior disclosed subject but is more or less specific than information previously disclosed; it also does not constitute "*the* specific information" warranting application of the official disclosure doctrine. Thus, the specificity and matching prongs work together to form the crux of the official disclosure doctrine: "disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf*, 473 F.3d at 378 (emphasis in original).

14

There is no exhaustive list of factors a court must consider under either prong. We also acknowledge that at times these prongs blend together, likely because it is rare to encounter a scenario in which the result is different under each. But delineating between the specificity and matching prongs of the *Wilson* test in this case demonstrates two major flaws in the district court's analysis. First, there is no meaningful difference between the Prior CENTCOM Disclosures and ARCENT's FOIA Production. Second, images of EFP damage from different terrorist attacks do not convey the same information such that disclosure of images from one attack constitutes a blanket waiver for images of other attacks under the official disclosure doctrine.

### A.    Specificity

Generally, for information to be "as specific as" that which was previously disclosed, there cannot be any "substantive differences between the content of the [publicly] released government documents and the withheld information." *Am. Civ. Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 620–21 (D.C. Cir. 2011) ("*ACLU v. DOD*"). For example, prior disclosure of "general descriptions" does not waive Exemption 1 for withheld documents that are more "specific and particular" and that "would reveal far more . . . than the previously released

15

records." *Id.* at 621 (citation omitted). Thus, specificity concerns the quality or kind of information about a particular topic that has been produced to the public.

Images of strike points from one EFP attack are "as specific as" images of strike points from another EFP attack. Each set of images conveys the same level and type of details across various attacks: that an explosive weapon penetrated an armored vehicle and caused damage to the vehicle and its passengers at a certain point in time and at a certain location.

Both the Prior CENTCOM Disclosures and ARCENT's FOIA Production included images of EFP strike points from terrorist attacks. Osen requests the same information from CENTCOM with respect to the remaining withheld images showing EFP damage of the attacks forming the subject of Osen's lawsuits. There is no principled distinction between ARCENT's FOIA Production—which the district court found constituted a waiver—and the Prior CENTCOM Disclosures— which the district court concluded did not—either from the other or from the remaining withheld images. Each of the disclosed and withheld images are equally specific; they tell the same stories, but about different attacks.[4]

---

[4] On appeal, Osen also relies on several other DoD disclosures that the district court did not explicitly consider. Those additional disclosures do not change the outcome on

16

The only way in which some of the Prior CENTCOM Disclosures are less specific than ARCENT's FOIA Production and the images CENTCOM withheld is that they neither contextualize, nor identify, the attack which caused the EFP damage displayed in the image. This lack of context is not uniform, however, as demonstrated by the DoD press conference slide deck, which identified the location and date of the attack that caused the damage seen in the photographs. Thus, the specificity prong of our analysis provides no basis to distinguish between the prior disclosures that the district court found did not waive Exemption 1, and the prior disclosures that the district court found did. Rather, all the prior disclosures upon which Osen relies satisfy the specificity prong of the *Wilson* test.

### B. Matching

That does not end the inquiry. Next, we must consider *Wilson*'s matching prong, under which "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that *appears*

---

appeal. They are either fairly characterized as general disclosures about the vulnerabilities of armored vehicles or the effectiveness of EFPs (which—as the district court suggested—would be too broad to trigger the official disclosure doctrine) or they are additional images of EFP attack damage, which have the same effect as the images of EFP damage that the district court did explicitly consider.

17

*to duplicate* that being withheld." *Wolf*, 473 F.3d at 378 (emphasis added) (quoting

*Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).[5]

Although we have questioned whether the matching prong "require[s]

absolute identity,"[6] we have repeatedly acknowledged that *Wilson* is a "precise

and strict test," under which we have explained that even a "substantial overlap"

between the requested information and previously disclosed information is not

---

[5] In explaining the origin of the official disclosure doctrine, a panel of this Court in *New York Times Co. v. U.S. Department of Justice*, 756 F.3d 100, 120 n.19 (2d Cir. 2014), noted in dicta that, although "*Wilson* remains the law of this Circuit," "a rigid application of it may not be warranted in view of its questionable provenance." To briefly recount that history, our Circuit adopted the official disclosure doctrine from a line of D.C. Circuit cases, the first of which relied in part on a district court decision and never articulated a "matching" requirement. *Id.* Thus, the *New York Times* panel expressed skepticism with overly relying on the matching prong of the *Wilson* test.

Osen has only urged us not to apply a more rigid version of the *Wilson* test than is warranted. Ultimately—as we recognized in *New York Times*—*Wilson* remains the law in this Circuit. Until it is overturned *en banc* or by the Supreme Court, we will continue to apply *Wilson*. In fact, this case demonstrates how each prong can serve a distinct purpose in determining whether an agency has disclosed "the *specific*" information at issue, thus triggering application of the official disclosure doctrine. *Wilson*, 586 F.3d at 186 (emphasis in original) (quoting *Hudson River Sloop Clearwater*, 891 F.2d at 421).

[6] By contrast, the D.C. Circuit appears to "insist[] on exactitude" under the matching prong, in recognition of "the Government's vital interest in information relating to national security and foreign affairs." *Wolf*, 473 F.3d at 378 (citations omitted); *accord ACLU v. DOD*, 628 F.3d at 621 (citation omitted). Under this interpretation, the fact that a "FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed," *N.Y. Times*, 756 F.3d at 120, is a feature, not a bug, of the official disclosure doctrine, because it prevents a FOIA requester from accessing undisclosed national security information.

enough to establish waiver. *N.Y. Times v. CIA*, 965 F.3d 109, 116, 119 (2d Cir. 2020).

Rather, there must be enough of an overlap in subject matter between disclosed

and withheld records to fairly say that the two records "match"—in other words,

that they present the same information about the same subject. *See Match*,

Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary

/match (defining "match" to include "to put in a set possessing equal or

harmonizing attributes" and "to cause to correspond"); *see also Fitzgibbon v. CIA*,

911 F.2d 755, 766 (D.C. Cir. 1990) (noting that a "prior disclosure waiver would not

operate on information pertaining to a time period later than the date of the

publicly documented information" because "the fact that information resides in

the public domain does not eliminate the possibility that further disclosures can

cause harm to intelligence sources, methods and operations" (citations omitted)).

Matching, by comparison to specificity, is therefore a question of what topics have

already been produced to the public.

*Wilson*'s matching prong is dispositive in this case.[7] Images of damage from

one EFP attack do not match images of damage from another EFP attack, and for

---

[7] Both parties seem to agree that this case turns on the matching prong. For example, CENTCOM summarized its appellate argument as follows: "because each EFP attack

that reason, none of the prior disclosures upon which Osen relies triggers the official disclosure doctrine for additional images from other attacks.

Take, for example, images of strike points and damage from Attack A and Attack B. Attacks A and B happened in different years, at separate locations, and involved different models of an armored vehicle. Each set of EFP strike point images provides the same kind and type of information about the attack it memorialized. But the images from Attack A say nothing about what happened during Attack B, and vice versa. In other words, the subject matter, facts, and details conveyed by one set of images are unique to that attack and are different from the subject matter, facts, and details conveyed by the other set of images—the information does not match.

Each of the prior disclosures at issue contains images of strike points from EFP attacks. Each disclosure reveals information about the vulnerabilities with which General Ferrell expressed concern in his affidavit—whether it be the date and location of the attack, the type of armor penetrated, the fact that an armored

---

presents a distinct set of factual circumstances, photographs of damage to American military equipment from one EFP attack do not 'match' photographs of damage to different American military equipment from different EFP attacks." Appellant's Br. 2. Osen responded in its own brief employing the "matching" terminology as well.

vehicle was hit by an EFP, or how and where that vehicle was damaged. But each disclosure says nothing about the attacks that the other disclosures depict. More importantly, the prior disclosures say nothing about the attacks from which images of EFP damage have never been disclosed.

Accordingly, each set of images effects an Exemption 1 waiver as to the same information about the specific attack to which they relate (as the district court found and as CENTCOM concedes); but none effects a blanket subject-matter waiver of Exemption 1 for all images of EFP damage from every terrorist attack across the board. The district court erred in finding that ARCENT's FOIA Production triggered the official disclosure doctrine and operated as a waiver of CENTCOM's Exemption 1 rights to withhold images showing EFP damage from terrorist attacks from which similar images have never been disclosed to the public.

The district court's justifications for its conclusion were that "CENTCOM d[id] not address distinctions between what ARCENT has disclosed and the information withheld," Special App. 20, and that ARCENT "[e]vidently . . . made a determination that this type of material does not pose a risk to national security," *id.* at 21. But the district court found that CENTCOM's explanation that each EFP

strike represents a unique factual scenario was sufficient to justify CENTCOM's withholdings in light of the Prior CENTCOM Disclosures. Because there is no meaningful difference between the Prior CENTCOM Disclosures and ARCENT's FOIA Production, there was no need for CENTCOM separately to address the ARCENT production. The outcome for each category should have been the same.

Further, whether information is or is not properly classified plays no independent role in the official disclosure doctrine analysis. The relevant considerations are the three prongs of the *Wilson* test—which together determine whether additional disclosure of information will, as the Government contends, harm national security. *See ACLU v. DOD*, 628 F.3d at 625 ("The 'officially acknowledged' test recognizes that even if information exists in some form in the public domain that does not mean that official disclosure will not cause harm cognizable under a FOIA exemption." (citation omitted)). Even though General Ferrell acknowledged that ARCENT is "the [DoD] component best able to determine whether to disclose the records," J.A. 151, ARCENT's reasons for disclosing the records is a separate consideration from whether the information that was disclosed waived Exemption 1 under the official disclosure doctrine. The

22

concern is whether additional disclosure would provide meaningfully different information such that production would cause harm.[8]

In that vein, ARCENT's FOIA Production does not contradict General Ferrell's declaration that a large disclosure of all such images will pose a unique risk to national security that smaller, isolated productions of the same type of images do not. ARCENT disclosed a small number of images that pertain to a single attack; it did not produce images of EFP damage *en masse*. What matters as it relates to waiver is the lack of any identifiable distinction between ARCENT's FOIA Production and the other disclosed images. And, more importantly, there is no basis in the record to support the district court's dispositive finding that ARCENT has deemed this entire category of military records as not posing a risk to national security and therefore ordering their production, other than the fact of the ARCENT production itself.

---

[8] Even if "ARCENT ha[d] made a determination that this type of material does not pose a risk to national security," Special App. 21, the specificity and matching prongs of the *Wilson* test require us to look at the specific information that has been disclosed previously—not presumed policy judgments underlying those disclosures—to establish waiver. *See ACLU v. DOD*, 628 F.3d at 621. The legitimacy of those types of policy judgments is considered when determining whether an entity has appropriately claimed an exemption. *See Discussion § II, infra*.

23

Thus, the district court erred in holding that ARCENT's FOIA Production waived Exemption 1 as to the other images of EFP damage that CENTCOM withheld as classified. As the district court recognized with respect to the Prior CENTCOM Disclosures, an official disclosure of EFP strike point images waives Exemption 1 only as to the same information about the same attack that those images memorialize. That same disclosure does not constitute a subject matter waiver for all images of EFP damage across all terrorist attacks.

## II.    FOIA Exemption 1

Resolution of Osen's claim of waiver does not bear on the question of whether CENTCOM properly invoked Exemption 1 by withholding images of EFP damage. Although the district court chose not to answer the exemption question once it found waiver, the court nevertheless made all the factual findings in its waiver analysis needed to resolve the exemption issue.[9] *Cf. Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016).

---

[9] Indeed, in response to the district court's attention to the merits of the exemption issue, both parties have presented substantial argument in their appellate briefs about the legitimacy of CENTCOM's national security justifications for its Exemption 1 withholdings.

24

"[A]n agency may invoke a FOIA exemption if its justification 'appears logical or plausible.'" *Am. Civ. Liberties Union v. Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) ("*ACLU v. DOJ*") (quoting *Wilner*, 592 F.3d at 73). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner*, 592 F.3d at 69. "The agency may meet its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions." *Id.* at 68 (quoting *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996)).

"Summary judgment is appropriate where the agency affidavits 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *ACLU v. DOJ*, 681 F.3d at 69 (quoting *Wilner*, 592 F.3d at 73). "In the national security context, however, we 'must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Id.* (emphasis in original) (quoting *Wolf*, 473 F.3d at 374).

25

General Ferrell stated the following about CENTCOM's decision to withhold images of EFP damage in his declaration supporting CENTCOM's motion for summary judgment:

> The largest category of withheld materials consists of photographs, text, and graphics depicting specific details of how EFPs/[Improvised Explosive Devices] were able to effectively penetrate the armor on American military vehicles. CENTCOM has withheld a substantial volume of photographs depicting damage to vehicles caused by EFPs. . . . [P]hotographs of damage to vehicles— while potentially not as revealing if viewed in isolation—are particularly sensitive when taken together with all of the other detailed information contained in the documents that have been released to [Osen]. The publication of these photographs alongside information about the composition of EFPs, the placement of EFPs, the number of EFPs contained in a particular attack array, the distance from EFPs to the affected vehicles, and the height at which EFPs were placed would reveal to American adversaries specific and detailed information about the vulnerabilities of American war-fighting equipment. This type of detailed information is not publicly available in this form or with this level of specificity, and would clearly illustrate the effectiveness of particular types of EFPs and combinations of critical variables.
>
> These considerations are sufficient to warrant the classification of each photograph relating to each individual attack at issue in [Osen's] FOIA requests. The potential harm is magnified, however, when considering the more than 500 pages containing photographs that [Osen] seeks to have released. Taken together, this trove of valuable information would provide American adversaries with enough material to draw conclusions about areas of vulnerability across multiple attacks, with clear depictions in official government documents to supplement whatever anecdotal information may be

26

available to adversaries based on past deployment of EFPs on the battlefield. Public disclosure of this information reasonably could be expected to cause serious damage to the national security by revealing in considerable and precise detail the vulnerabilities and capabilities of critical military equipment and infrastructure, and it therefore remains properly classified in accordance with Sections l.4(a) and l.4(g) of Executive Order 13,526.

J.A. 131–32 (paragraph numbers omitted).

Osen argues that, because CENTCOM never disclosed the "other detailed information" that General Ferrell contends makes images of EFP damage "particularly sensitive," CENTCOM's proffered "mosaic argument"—that innocuous information becomes sensitive when considered alongside other information in the public sphere—falls short. But this fails to consider the other justifications for withholding the images that CENTCOM provided through General Ferrell.

First, General Ferrell declared that the risk to national security is increased by producing all of the approximately 500 pages of images that CENTCOM is currently withholding pursuant to Exemption 1, regardless of whether it withholds the "other detailed information." Moreover, in his supplemental affidavit, General Ferrell explained:

> Each individual photograph showing the penetration of armor by EFPs that has been withheld from CENTCOM's responses to [Osen's] FOIA requests reveals information about the vulnerabilities of American war-fighting equipment. CENTCOM would have withheld each of these photographs even if it had been responding to separate FOIA requests from individual requestors on an incident-by-incident basis.

J.A. 156.

As the district court acknowledged, we cannot ignore either of these declarations. To the contrary, in the national security context, we must give them substantial weight. *See ACLU v. DOJ*, 681 F.3d at 69. We have repeatedly found that it is appropriate to "defer[] to executive [declarations] predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Am. Civ. Liberties Union v. Dep't of Def.*, 901 F.3d 125, 134 (2d Cir. 2018) (second alteration in original) (quoting *ACLU v. DOJ*, 681 F.3d at 70). "[G]iven 'relative competencies of the executive and judiciary, we believe that it is bad law and bad policy to "second-guess the predictive judgments made by the government's intelligence agencies."'" *Id.* (quoting *ACLU v. DOJ*, 681 F.3d at 70-71 (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003))).

General Ferrell's determination that disclosure of even an individual image of EFP damage from a single attack can pose a risk to national security by evidencing vulnerabilities of military armor is both logical and plausible. *See ACLU v. DOJ*, 681 F.3d at 69. So too is his explanation that a disclosure of a substantial number of images could pose a significantly greater risk to national security than disclosure of just a handful. Accordingly, neither we nor the district court are in any position to deem these approximately 500 pages of images improperly withheld as classified.

The record does not suggest any bad faith on the part of DoD. *See id.* Indeed, the district court expressly noted that "[g]iven CENTCOM's accommodations during this litigation, as well as its demonstrated willingness to address redactions where [Osen] points to inconsistencies, . . . [there is] no reason to doubt CENTCOM's good-faith efforts . . . or its continued willingness to work with [Osen] in addressing these disputes." Special App. 29 n.7.

Nor does the record contradict the General's conclusions. General Ferrell's declaration that a larger production of these types of images would endanger U.S. armed forces is not inconsistent with the existence of those prior disclosures, as Osen merely points to a handful of disclosures of images showing EFP damage

from different attacks during the relevant time period. The more images of different attacks that become available to the public, the more adversaries might learn about the Army's weaponry, a potential development that CENTCOM logically posits puts national security at risk. Of course, the more images of individual attacks that components of DoD voluntarily release on a piecemeal basis, the less compelling this position will become; but as it stands, CENTCOM's reasoning is sound, and entitled to substantial weight in its favor.

Accordingly, CENTCOM's withholdings under Exemption 1 are appropriate, unless Exemption 1 has already been waived with respect to specific information about the specific attack at issue through prior official disclosure of strike point images from that attack.

## CONCLUSION

For the reasons stated above, we **VACATE** the judgment in part and **REVERSE** the decision of the district court. We **REMAND** so that the district court may enter an order and judgment consistent with this opinion.

MENASHI, *Circuit Judge*, concurring:

I join the opinion of the court in full and write separately to address the district court's conclusion that, under the official disclosure doctrine, it is not "appropriate to limit a waiver of Exemption 1 to subcomponents of the same agency." *Osen LLC v. U.S. Cent. Command*, 375 F. Supp. 3d 409, 422 (S.D.N.Y. 2019).

I agree with the court that CENTCOM did not challenge this holding on appeal. And because the prior disclosures that Osen identifies do not match CENTCOM's withholdings, we need not resolve this question to reverse the judgment of the district court. Still, the court appropriately cautions that "disclosure by one component of an Executive department or agency does not automatically implicate the official disclosure doctrine for another component of the same department or agency." *Ante* at 13 n.3. Indeed, there are strong reasons to doubt the district court's conclusion that one subcomponent can waive Exemption 1 for another subcomponent of the same agency.

First, the plain text of Exemption 1 permits an agency to withhold information "specifically authorized under … an Executive order to be kept secret in the interest of national defense or foreign policy" that is "in fact properly classified pursuant to such Executive order," without regard to whether that information has been the subject of prior disclosures. 5 U.S.C. § 552(b)(1). We have therefore explained that an agency may withhold such information despite "widespread public discussion of [the] classified matter," "statements made by a person not authorized to speak for the [a]gency," or "release of information by *another agency*, or even by Congress." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (emphasis added).

The district court assumed that "another agency" must mean a government authority without a common superior short of the President. *See Osen*, 375 F. Supp. 3d at 422. But the Freedom of Information Act (FOIA) defines "agency" to mean, among other things, "each authority of the Government of the United States, *whether or not it is within or subject to review by another agency*." 5 U.S.C. § 551(1) (emphasis added); *see id.* § 552(f).[1] Courts have applied this definition to conclude, for example, that the Centers for Disease Control and Prevention (CDC), the Public Health Service (PHS), and the National Institute for Occupational Safety and Health (NIOSH)—three subcomponents of the Department of Health and Human Services (HHS)—and the Federal Bureau of Prisons—a subcomponent of the Department of Justice—are each separate agencies for purposes of the FOIA and of the Administrative Procedure Act, which shares the same definition. *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1121 & n.2 (D.C. Cir. 1989); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1239 (10th Cir. 2005).

Because the FOIA's provisions for disclosure and withholding apply to a subcomponent independent of its relationship with another subcomponent of the same or of a different parent agency, *see* 5 U.S.C. § 552(a)(3)(A), (8)(A), it would be anomalous to conclude that the subcomponent's authority to withhold records depends on the independent decisions of another entity also considered an "agency" under the statute. Moreover, because the FOIA defines "agency" without regard to "whether or not it is within or subject to review by

---

[1] "Section 552(f) of [the] FOIA incorporates the definition of 'agency' contained in section 551(1) of the APA by reference," *Grand Cent. P'ship. v. Cuomo*, 166 F.3d 473, 484 (2d Cir. 1999), and "expand[s]" that definition "for FOIA purposes," 1 Kristin E. Hickman & Richard J. Pierce, Jr., Administrative Law Treatise § 1.2, at 5 (6th ed. 2019).

another agency," it would conflict with the statutory scheme for courts to engraft onto the FOIA a judge-made doctrine that gives this consideration dispositive weight.

Second, imputing waivers between subagencies that address FOIA requests independently, each with "its own FOIA staff and FOIA procedures," *Osen*, 375 F. Supp. 3d at 415, would add unnecessary administrative burden. "There are currently one hundred agencies subject to the FOIA with several hundred offices that process FOIA requests."[2] In the Department of Defense (DoD) alone, there are nineteen components that "have their own FOIA programs, including a FOIA appellate authority," and thirteen additional components that "have their own FOIA programs" and a consolidated appellate authority.[3] Requiring each component of the DoD to involve itself in the work of thirty-one other components, on pain of potentially being forced to disclose information that has been

---

[2] Office of Info. Policy, U.S. Dep't of Justice, *Frequently Asked Questions: Where do I send a FOIA request?*, https://www.foia.gov/faq.html (last visited July 29, 2020).

[3] U.S. Dep't of Def., Manual 5400.07, *DoD Freedom of Information Act (FOIA) Program* 6-7 (Jan. 25, 2017). These components include the Department of the Army, Department of the Navy, Department of the Air Force, Defense Commissary Agency, Defense Contract Audit Agency, Defense Contract Management Agency, Defense Finance and Accounting Service, Defense Health Agency, Defense Information Systems Agency, Defense Intelligence Agency, Defense Logistics Agency, Defense Security Service, Defense Threat Reduction Agency, Department of Defense Education Activity, National Geospatial-Intelligence Agency, National Reconnaissance Office, National Security Agency/Central Security Service, and Office of the Inspector General of the Department of Defense. *Id*.

properly classified in the interest of national security, would increase administrative costs significantly and without justification.[4]

The FOIA has been criticized for imposing administrative burdens.[5] Justice Scalia, when a law professor, called it "the Taj Mahal of the Doctrine of Unanticipated Consequences, the Sistine Chapel of Cost-Benefit Analysis Ignored."[6] We should not casually compound that burden through judge-made doctrines, such as the official disclosure doctrine, that fail to take account of the legal framework that governs FOIA administration.[7]

---

[4] One researcher estimated "[t]he total cost of FOIA implementation, among cabinet-level departments from 1975 until 2015," at $6.3 billion. A.J. Wagner, *Essential or Extravagant: Considering FOIA Budgets, Costs and Fees*, 34 GOV'T INFO. Q. 388, 393 (2017). "FOIA costs for the year 2015 [alone] amounted to $403 million." *Id*.

[5] *See* Mark Fenster, *The Opacity of Transparency*, 91 IOWA L. REV. 885, 907, 937 (2006) ("Agency efforts to comply with FOIA are expensive …. Disclosure requirements create [additional] costs to government operations and the public in a number of ways [including] by forcing disclosures that actually harm national security.").

[6] Antonin Scalia, *The Freedom of Information Act Has No Clothes*, REGULATION, Mar.-Apr. 1982, at 14, 15.

[7] We have previously suggested that the official disclosure doctrine is of "questionable provenance." *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 120 n.19 (2d Cir. 2014). But the doctrine ultimately seems to be an application of the requirement that an agency's justification for invoking Exemption 1 be "logical or plausible." *Wilner v. NSA*, 592 F.3d 60, 75 (2d Cir. 2009). It would be neither logical nor plausible for an agency to claim that information has been properly classified in the interest of national security when it has already publicly released the exact same information. For that reason, cases applying the official disclosure doctrine often come down to whether it is logical or plausible that release of the withheld information would reveal something else. *See, e.g.*, *N.Y. Times v. CIA*, 965 F.3d 109, 122 (2d Cir. 2020) ("It is still 'logical or plausible' that disclosing the existence or nonexistence of an intelligence interest in such a program would reveal something not

Third, both the FOIA statute and implementing regulations adopted by the DoD contemplate the potential "need for consultation … with another agency … *or among two or more components of [an] agency*." 5 U.S.C. § 552(a)(6)(B)(iii)(III) (emphasis added); *see also* 32 C.F.R. § 286.7(d)(1) ("[T]he DoD Component initially processing the request should typically consult with all interested DoD Components or other Federal agencies prior to making a release determination."). It would undermine this scheme if one DoD component's refusal or failure to consult with another DoD component could waive the second component's ability to withhold records under Exemption 1.

Observers might assume that subagencies within the same department must follow common policies or share common interests. But "agencies, like nearly all large organizations, are not unitary actors. They are fractured internally."[8] "Beneath the surface of the administrative state are constant battles, between and within agencies," and indeed "like the conflict between agencies, subagencies can clash."[9] When subagencies "share overlapping duties," as would likely be the case when subagency records contain common information, rivalry is at least as likely as cooperation.[10] So

already officially acknowledged and thereby harm national security interests."); *ACLU v. CIA*, 710 F.3d 422, 429 (D.C. Cir. 2013) ("The question before us, then, is whether it is 'logical or plausible' for the CIA to contend that it would reveal something not already officially acknowledged to say that the Agency 'at least has an intelligence interest' in such strikes.") (internal citation omitted).

[8] Elizabeth Magill & Adrian Vermeule, *Allocating Power Within Agencies*, 120 YALE L.J. 1032, 1036 (2011).

[9] Daniel A. Farber & Anne Joseph O'Connell, *Agencies as Adversaries*, 105 CAL. L. REV. 1375, 1378, 1405 (2017).

[10] *Id.* at 1405.

rather than impose the courts' assumptions about agency behavior on the FOIA, it would perhaps be more prudent to follow the statutory scheme and to identify each government authority with its own FOIA office as a separate "agency."

There does not seem to be a principled reason grounded in the statute for a subagency to be able to waive Exemption 1 for another subagency in the same department—when both subagencies address FOIA requests independently—but not for a subagency in another department that similarly handles FOIA requests independently. *See Wilson*, 586 F.3d at 186. Under such a scheme, a disclosure by the Defense Intelligence Agency (DIA), a DoD component, of a record that was jointly drafted by the CIA and the DIA would not affect the CIA's ability to withhold the record but would waive the Defense Health Agency's ability to do so, solely because the Defense Health Agency happens to be a DoD component. That would be an odd result.

Accordingly, the question of whether a subagency's disclosure waives another subagency's ability to apply Exemption 1 should be carefully considered when it arises in an appropriate case.[11]

---

[11] This is an open question in our circuit. The D.C. Circuit, meanwhile, has said that while it would avoid "forcing one agency to adopt another's official disclosure of information common to both," *Marino v. DEA*, 685 F.3d 1076, 1082 (D.C. Cir. 2012), that "rule does not apply … where the disclosures are made by an authorized representative of the agency's parent," *ACLU*, 710 F.3d at 429 n.7. While it might make sense that a subagency would be bound by the determination of a superior authority— that is, the disclosure decisions of the HHS Secretary would bind the CDC— the same logic does not apply where the two agencies are coequal, though share a common parent—such as the CDC and the PHS. *Cf. N.Y. Times*, 965 F.3d at 121 (indicating that a disclosure by the President, but not by an official of the Defense Department, could bind the CIA).